IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

**FILED**

**June 5, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 12-1138

IN RE: TIMBER M. AND REUBEN M.

Appeal from the Circuit Court of Greenbrier County
Honorable James J. Rowe
Civil Action Nos. 11-JA-46 and 11-JA-47

AFFIRMED, IN PART, VACATED, IN PART,
AND REMANDED WITH DIRECTIONS

Submitted: May 15, 2013
Filed: June 5, 2013

Eric M. Francis, Esq.
Kristopher Faerber, Esq.
Lewisburg, West Virginia
Attorney for Petitioner Norma G.

Patrick Morrissey, Esq.
Attorney General
Charleston, West Virginia
Lee A. Niezgoda, Esq.
Assistant Attorney General
White Hall, West Virginia
Attorneys for Respondent Department
of Health and Human Resources

Joshua L. Edwards, Esq.
Lewisburg, West Virginia
Guardian *Ad Litem* for Timber M.
and Reuben M.

JUSTICE LOUGHRY delivered the opinion of the Court.
CHIEF JUSTICE BENJAMIN concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.
JUSTICE WORKMAN concurs and reserves the right to file a separate opinion.

**SYLLABUS BY THE COURT**

1.  "'Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.' Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996)." Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

2.  "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996).

3.  ""In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. pt. 1, *State ex rel. Cash v. Lively,* 155 W.Va. 801, 187 S.E.2d 601 (1972).' Syllabus Point 4, *State ex rel. David*

i

*Allen B. v. Sommerville*, 194 W.Va. 86, 459 S.E.2d 363 (1995)." Syl. Pt. 2, *In the Interest of Kaitlyn P.*, 225 W.Va. 123, 690 S.E.2d 131 (2010).

4. """"Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W.Va. Code, 49-6-5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W.Va. Code, 49-6-5(b) [1977] that conditions of neglect or abuse can be substantially corrected.' Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syllabus point 4, *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989).' Syl. Pt. 1, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993)." Syl. Pt. 6, *In re Isaiah A.*, 228 W.Va. 176, 718 S.E.2d 775 (2010).

5. "'[C]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened . . . .' Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syl. Pt. 4, in part, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

6. In cases involving the abuse and neglect of children, when it appears from this Court's review of the record on appeal that the health and welfare of a child may be at risk as a result of the child's custodial placement, regardless of whether that placement is an

issue raised in the appeal, this Court will take such action as it deems appropriate and necessary to protect that child.

LOUGHRY, Justice:

This case is before this Court upon the appeal of the petitioner, Norma G.,[1] from the Circuit Court of Greenbrier County's August 16, 2012, order terminating her parental rights to her children, Timber M. and Reuben M. The petitioner asserts that her due process rights have been violated, that no imminent danger existed at the time her children were taken into custody, that she should have been granted an improvement period, and that the lower court failed to impose the least restrictive alternative disposition so as to protect the best interests of her children. Based upon the record, the parties' briefs, and the arguments presented, we find no error. Accordingly, we affirm the termination of Norma G.'s parental rights; however, we remand for a determination of whether the permanent placement of the children with their biological father is appropriate.

## I. Factual and Procedural Background

On August 9, 2011, Timber M., born on December 25, 2002, disclosed to her mother, the petitioner, Norma G. ("the mother"), that her stepfather, Jack G., had been showing her pornographic movies on a portable DVD player when she was with him in his truck. Timber also disclosed that Jack G. had exposed his genitals to her in a shed where the family kept their bicycles and that he attempted to coerce her into watching him masturbate.

[1]We follow our traditional practice in child abuse and neglect matters, as well as other cases involving sensitive facts, by abbreviating the last names of the parties. *See*, *e.g.*, *In re Jessica G.*, 226 W.Va. 17, 697 S.E.2d 53 (2010). *See also* Rule 40(e)(1) of the *West Virginia Rules of Appellate Procedure*.

The mother testified below that on August 10, 2011, she instructed Timber on how to use her cell phone to make an audio recording. She then encouraged the eight-year-old Timber to go with Jack G. in his truck in hopes that Timber would be able to record his sexual abuse of her. The mother further testified that Timber did record a conversation with Jack G. regarding the pornographic videos.

The mother also testified that on August 12, 2011, she sent a text message to the cell phone of Corporal Roger Baker of the Greenbrier County Sheriff's Department[2] regarding Timber's recent disclosures and arranged to meet with him on August 15, 2011. The mother testified that the day before she was to meet with Cpl. Baker, she confronted Jack G., who admitted his misconduct with regard to Timber. The mother alleges that she told Jack G. to leave the home, but that he refused. She further testified that the following day, Cpl. Baker did not appear for their meeting. Cpl. Baker testified below that he did not remember receiving a text message from the mother on August 12, 2011.

The mother alleges that she protected Timber M. and Reuben M.[3] by moving her mother and her stepfather into the home and by ensuring the children were never alone with Jack G. However, the testimony of the mother's stepfather revealed that he and his wife

---

[2]Cpl. Baker handles child abuse and neglect cases in Greenbrier County.

[3]Reuben M. was born on July 12, 2004.

2

moved into another structure on the property–not into the family home. Further, the children revealed during these proceedings that contrary to the mother's testimony, they were left alone with Jack G. following Timber's disclosure.[4]

On December 20, 2011, more than four months after Jack G. admitted to the mother that he had abused Timber, the mother contacted Cpl. Baker to report the abuse and the fact that she could not get Jack G. to leave the home. On this same day, Jack G. gave a statement to Cpl. Baker during which he confessed to showing Timber pornographic movies and to exposing his genitals to her. Cpl. Baker made arrangements for Timber to undergo a forensic interview at the Child and Youth Advocacy Center ("CYAC") in Greenbrier County, and he also contacted Child Protective Services ("CPS") of the West Virginia Department of Health and Human Resources ("the Department"). The forensic interview of Timber was conducted on December 21, 2011, during which she disclosed the same allegations of sexual abuse by her stepfather, Jack G.

Also, on December 21, 2011, the mother was interviewed by a Department employee and CYAC workers during which she admitted that she had known about the sexual abuse of Timber since August 9, 2011. She explained that she had taken matters into

---

[4]The record contains a Court Appointed Special Advocate report dated February 2, 2012, which reflects that Timber told the guardian ad litem in this case that: "My Mommy told me to tell you that I was never alone with Jack after I told her [about the abuse]."

her own hands due to what she perceived were prior failures of the Department[5] and law enforcement to take action. The mother admitted that she had provided Timber with a cellular telephone so that the child could record Jack G.'s abuse of her, and that she then used the recording to persuade Jack G. to convey his real property[6] to her and to leave the home. Although Jack G. conveyed the property to her, he refused to leave.

On December 20, 2011, Jack G. was arrested and admitted to the sexual abuse of Timber. The following day, the Department removed the children from the home and an order ratifying emergency custody was entered in the Greenbrier County Magistrate Court.[7]

---

[5]It appears that the mother is referencing the referral made to CPS on August 3, 2011, by Lorie Tilley, a person who attends the same church as the mother and the children. Ms. Tilley testified that she reported her suspicion that Timber M. was being abused, including sexual abuse, based upon disclosures made by Timber to Ms. Tilley's daughter, but that she had mistakenly identified the suspected abuser as Timber's biological father, Kevin M. Contrary to Ms. Tilley's testimony below, the Department alleges that its documentation on this referral did not contain any allegations of a sexual nature and that the referral was "screened out" because the allegations did not meet the "legal standard for abuse/neglect." The mother is also referencing her multiple referrals to CPS against Kevin M. between 2004 and 2008, following her separation from Kevin, which CPS found were either unsubstantiated or did not meet the statutory definition of abuse and/or neglect. While there are multiple references in the record to the parents' divorce, the mother testified that she was never married to Kevin M.

[6]It appears from the record that this property consisted of more than 100 acres in Greenbrier County.

[7]The record contains a Social Summary dated January 24, 2012, prepared by CPS worker Davina Agee, which reflects that the children were initially placed with a paternal uncle, then briefly with foster parents, and then with a maternal uncle and aunt, where they remained until disposition.

On December 22, 2011, the Department filed a verified Petition to Institute Child Abuse and Neglect Proceedings in the Circuit Court of Greenbrier County.[8]  The Department alleged, inter alia, that the conduct constituting abuse and/or neglect[9] included that the mother knew of the sexual abuse of Timber by Jack G. but failed to protect her daughter and allowed her to be alone with the stepfather.  The Department also alleged that

> [i]t is not in the best interest of the children to remain in the home due to the sexual abuse in the home and [the mother's] blatant failure to protect her daughter and to continue to place her in danger by allowing the sexual abuser to have unsupervised access to Timber [M.].

---

[8]On December 22, 2011, the circuit court entered an Initial Order Upon Filing of Petition in which it transferred custody of the children to the Department; appointed counsel for the mother, the father, Kevin M., and the stepfather, Jack G.; appointed a guardian ad litem to represent the children; and directed the Department to convene a Multi-Disciplinary Team. On January 4, 2012, the circuit court entered an Order Appointing Court Appointed Special Advocate to independently gather information into the circumstances of the children.

[9]West Virginia Code § 49-1-3(1)(A) (2009 & Supp. 2012) defines an "abused child," in relevant part, as one "whose health or welfare is harmed or threatened by: (A) A parent . . . who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home."  Further,

> [w]here there is clear and convincing evidence that a child has suffered physical and/or sexual abuse while in the custody of his or her parent(s), guardian, or custodian, another child residing in the home when the abuse took place who is not a direct victim of the physical and/or sexual abuse but is at risk of being abused is an abused child under W.Va. Code, 49-1-3(a) (1994).

*In the Interest of Kaitlyn P.*, 225 W.Va. 123, 127 n. 6, 690 S.E.2d 131, 135 n. 6 (2010) (quoting Syl. Pt. 2, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995)).

A preliminary hearing was held on January 4, 2012. At this hearing, the mother stipulated that at the time the children were removed from her home, probable cause existed that they were in imminent danger due to the distribution of obscene matter by the children's stepfather, Jack G., and due to her failure to protect the children.

In a Social Summary dated January 24, 2012, which was filed in the circuit court, CPS worker Davina Agee stated, as follows:

> The psychological and emotional well being of these children are paramount. . . . At this point, Timber [M.] has been sexually groomed by Jack [G.]. After telling her mother, Norma, about the abuse, the child was forced to live in the same house every day with her abuser for three[10] months, while Norma extorted Jack for property. That during the past three months, the children were not just made to live in the same house with Jack, but were also left alone with him on several occasions. Therefore, Norma, knowingly allowed unsupervised contact between her child and her abuser, and in doing so, Norma acted with complete disregard for Timber's well being, physical safety and mental/emotional needs.

(Footnote added).

On February 8, 2012, the mother filed a motion for a post-adjudicatory improvement period in which she relied upon the report of her forensic psychiatric evaluator, Bobby Miller, M.D., which stated that although the mother was not currently capable of providing adequate parenting to her children due to her "admitted poor judgment and parental

---

[10]As indicated previously, this time period was actually in excess of four months.

inaction[,]" she could possibly be successful in an improvement period with special accommodations, such as the appointment of someone to act as mediator between her and the Department.

On February 17, 2012, the parties appeared before the circuit court for an adjudicatory hearing with the understanding that the mother would stipulate to the allegations of abuse and neglect upon which the Department would recommend an improvement period.[11] However, during this hearing, the mother would not admit that she had abused her children. Thereafter, a contested adjudicatory hearing was held on May 22, 2012, during which Cpl. Baker testified that after the mother contacted him on December 20, 2011, she told him that she had confronted her husband, Jack G., and told him, "here's what you're going to do, you're going to sign the farm over to us, and then you're going to leave, and I'm not going to go to the police." Cpl. Baker also testified that when he asked the mother whether Jack G. had, in fact, conveyed the farm to her, she responded, "yeah, I own it lock, stock, and barrel." CYAC employees testified similarly and noted that Jack G.'s refusal to leave the home after he conveyed the farm to the mother was the reason she contacted law enforcement on December 20, 2011.

---

[11]During a subsequent hearing, the guardian ad litem explained that the MDT had drafted terms and conditions for this improvement period.

During the course of the May 22, 2012, hearing, the mother testified that she did not believe that Timber was in danger when she allowed her to get into a vehicle alone with Jack G., after she had disclosed the abuse. The mother testified that Jack G. "had not been violent. He had not done anything. She had already seen the [pornographic] videos. I felt that it was the only way I was going to . . . catch him." She further testified that Jack G. conveyed his farm to her shortly after she confronted him about Timber in August 2011. When asked whether she contacted law enforcement or the Department during the four months between Timber's disclosure on August 9, 2011, and when she contacted Cpl. Baker on December 20, 2011, the mother responded, "No, like I said what good would it have done. They didn't respond the first time."[12]

On May 30, 2012, the circuit court entered an Order Following Adjudicatory Hearing in which it found that:

---

[12]On June, 25, 2012, the Court Appointed Special Advocate director, Jenny Castle, filed a report with the circuit court in which she commented on the mother's four-month delay in contacting law enforcement, as follows:

> Was this due to the time it took to transfer all the titles and deeds over into her name? Why was she no longer "afraid" that he (Cpl. Baker) would not help her? How after this amount of time did she develop the "trust" in the system to call for assistance in removing [Jack G.] (because he refused to leave) yet when she was questioned about her responsibility of not protecting her children she immediately turned back to not being able to "trust the system"?

Ms. Castle further commented in this regard that she was "unaware of any specific treatment or program that would teach a parent not to allow their child to be continuously abused by living with her perpetrator in order to gain a $350,000 farm and all its equipment."

8

3. [The mother] had failed to protect the children from a known sexual abuser.

4. Reuben was at risk for being abused while remaining in the home with Jack [G.].

5. [The mother] knowingly allowed Jack [G.] to sexually exploit Timber.

6. [The mother] placed Timber at risk for further abuse while remaining in the home with Jack [G.].

7. Pursuant to West Virginia Code §49-6-2(c) there is clear and convincing evidence that, based upon the conditions existing at the time of the petition, the children have been abused as defined in West Virginia Code §49-1-3.

On July 24, 2012, a hearing was held on the mother's motion for a post-adjudicatory improvement period. During this hearing, Dr. Miller testified that not only did the mother not think that she had done anything wrong, but that she also believed that "she was actually justified in doing what she did." He added, "I still think she doesn't fully grasp that what she did was not the appropriate thing to do." During the mother's testimony, she again refused to acknowledge that her actions following Timber's disclosure constituted abuse of her children. Both the Department and the children's guardian ad litem ("GAL") asked that the mother's motion for a post-adjudicatory improvement period be denied. Thereafter, in the circuit court order denying the mother's motion, the court found, as follows:

[T]he [mother] failed to demonstrate, by clear and convincing evidence, that she is likely to fully participate in the

9

improvement period. Although [the mother] testified that she is willing to participate . . . in an improvement period, the Court finds that she has yet to take responsibility for her actions or inactions and acknowledge that her failure to protect the children constituted abuse to the children. Due to the [mother's] failure to acknowledge the existence of any problem the Court finds granting an improvement period would be futile at this point in the proceedings.

The case then moved forward to the disposition hearing, which was held on August 14, 2012. During this hearing, CPS worker Crystal Stock testified that the termination of the mother's parental rights was in the children's best interest and that there was no reasonable likelihood that the conditions of abuse and neglect could be corrected because of the mother's failure to admit that there are any problems.[13] The Court Appointed Special Advocate director, Jenny Castle, testified similarly. When asked during this hearing whether she had abused her children, the mother responded that Jack G. abused her children and that she could not say that she had abused them. Thereafter, the Department and the GAL advised the circuit court that they sought the termination of the mother's parental rights. The mother's counsel asked the circuit court to "terminate [the mother's] right to physical custody and terminate [the mother's] right to visitation . . . [but] leave the parental rights intact."[14] At the conclusion of the disposition hearing, the circuit court stated as follows:

_____

[13]The Department states that it offered the mother the opportunity to participate in parenting and adult life skills, but those services were refused.

[14]The Department argued that a termination of the mother's custodial rights to her
(continued...)

10

> What brought this family into court in the first place is the lack on the part of their mother in the - - a fundamental requirement of every parent, and that is to have a basic fundamental understanding of what is reasonably necessary to protect children, and in this case protect young children and a daughter who's been exposed and . . . who was required to live in a household of an abuser . . . although [the mother] says, yes, she made a mistake . . . [,] the mistake would be corrected by gaining an insight, understanding as to what her obligation as to the children's mother is to provide basic protection from abusers and from sex offenders . . . .

The circuit court further explained that

> everyone it appears to be with the exception of [the mother] has worked towards focusing on the best interests of the children and tried to get this resolved but we couldn't get over that initial hurdle, and there's just simply no reason why the department should continue to expend resources for [the mother] if she's not willing to absorb and incorporate and make it a part of who she is, and this hasn't been evidenced from the get-go and so it's not really a tough decision at all. . . . I see no reasonable alternative other than to terminate her rights as their parent, and it doesn't mean that they don't have a right to have continued contact as it is in their best interest with their mother and reasonable visitation . . . and that [the father] can . . . allow the children to have supervision with their mother as is in their best interests.[15]

(Footnote added).

---

[14](...continued)
children, but not her parental rights in their entirety, would leave the door open for the mother to seek custody at a later time, which would not achieve permanency for the children. The Department further argued that permanency would be best achieved by placing the children with their biological father and terminating the parental rights of the mother.

[15]During oral argument, counsel stated that the mother visits with her children every Sunday in Kevin M.'s home and she has the opportunity for telephone contact with them during the week.

11

On August 16, 2012, the circuit court entered a dispositional order accepting the children's permanency plan filed by the Department. The circuit court found that the mother is "presently unwilling to adequately provide for the children's needs[;]" that "[t]here is no reasonable likelihood that the conditions of abuse can be substantially corrected in the near future[;]" that the mother "has failed to comply with the requirements to rectify the conditions of abuse[;]" that she "has repeatedly failed to acknowledge that her actions constituted abuse of the children[;]" and that she "has failed to recognize that she failed to protect her children and that she does not have the capacity to recognize and remedy that failure in the near future." The circuit court found the welfare and best interests of the children required the termination of the mother's parental rights to Timber M. and Reuben M., and the court granted both physical and legal custody of the children to their biological father, Kevin M.

## II. Standard of Review

We are asked to review a circuit court's order entered upon a petition for termination of parental rights. We have previously stated that abuse and neglect proceedings will be evaluated under a "compound standard of review: conclusions of law are subject to a *de novo* review, while findings of fact are weighed against a clearly erroneous standard." *In re Emily*, 208 W.Va. 325, 332, 540 S.E.2d 542, 549 (2000). Indeed, our standard of review in this regard is well established:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011). With these standards in mind, the parties' arguments will be considered.

## III. Discussion

In the present appeal, the mother asserts that the Department violated her due process rights by repeatedly ignoring applicable statutes, procedural rules, and the Department's Child Protective Services Policy manual ("policy manual").[16] She also asserts that the circuit court failed to protect the best interests of the children by failing to employ a dispositional alternative that was less restrictive than a termination of her parental rights. Further, the mother argues that because Jack G. was removed from the home on December 20, 2011, there was no imminent danger warranting the removal of the children from the home on December 21, 2011. Lastly, the mother asserts that she was denied a meaningful opportunity to request and participate in an improvement period.

We begin our analysis of these issues by acknowledging that

> "[i]n the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and

---

[16]The mother also makes general references to the Department violating the "Gibson decree" in her appellate brief. The Department states that the "Gibson decree" is an amended consent decree entered in *Gibson v. Ginsberg*, No. 78-2375 (S.D.W.Va. Sept. 28, 1981), and that its terms have been incorporated into its policy manual in an effort to fully comply with its requirements. Because the mother fails to provide any analysis concerning this decree in her appellate brief, her references to the same are addressed herein only to the extent that the *Gibson* decree has been incorporated into the Department's policy manual. *See State, Dept. of Health v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995) ("[a] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim . . . . Judges are not like pigs, hunting for truffles buried in briefs." (Internal citations omitted).).

14

United States Constitutions." Syllabus Point 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973).

Syl. Pt. 2, *Lindsie D.L. v. Richard W.S.*, 214 W.Va. 750, 591 S.E.2d 308 (2003). We must also be mindful, however, of our basic tenet that "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996). Indeed, "'"[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. pt. 1, *State ex rel. Cash v. Lively,* 155 W.Va. 801, 187 S.E.2d 601 (1972).' Syllabus Point 4, *State ex rel. David Allen B. v. Sommerville*, 194 W.Va. 86, 459 S.E.2d 363 (1995)." Syl. Pt. 2, *In the Interest of Kaitlyn P.*, at 123-124, 690 S.E.2d at 131-132.

## A. Denial of due process.

The mother contends that she was denied due process because the Department allegedly ignored applicable statutes and rules of procedure, as well as its policy manual and its pamphlet titled: "A Parent's Guide to Working with Child Protective Services" ("pamphlet"). In particular, the mother asserts that the Department (1) failed to inform her of her right to counsel before interviewing her on December 20, 2011; (2) failed to notify her of the time and place of the emergency custody ratification hearing or her opportunity to be present for the same; and (3) failed to file either a family functioning assessment as required by Department policy, a family case plan as required by West Virginia Code § 49-6-2(b), or

15

a child case plan as required by West Virginia Code § 49-6-5, all of which deprived both her and the circuit court of necessary information. We find no merit in the mother's argument.

Regarding the right to counsel, the Department's policy manual simply requires its employee to ask the parent whether he or she has counsel and, if so, to contact the lawyer before interviewing the parent.[17] As the Department argues, and as we agree, the policy manual does not confer upon any parent additional procedural due process rights not already provided under existing law. Further, the Department's informational pamphlet merely describes a court appointing counsel *after* a legal proceeding has been instituted, which is consistent with West Virginia Code § 49-6-2(a) (2009 & Supp. 2012).[18] In short, the mother does not point to any law that affords a parent the right to counsel pre-petition. Moreover, the circuit court appointed counsel to represent the mother the same day the Department filed the abuse and neglect petition. For these reasons, we conclude that there was no denial of due process to the mother in this regard.

---

[17]Although it is unclear from the record whether the Department worker asked the mother whether she was represented by counsel at the time of her initial interview, the mother does not claim that she was represented by counsel at that time. Consequently, her interview would have proceeded in the manner in which it did in any event.

[18]West Virginia Code § 49-6-2(a) requires the circuit court to advise a parent of his or her right to be represented by counsel in a child abuse and neglect proceeding and to appoint counsel if the parent cannot afford counsel.

16

We next address the issue of notice of the emergency ratification hearing. When the Department takes a child into emergency custody, the Department worker is required to immediately apply for an order ratifying the emergency custody under West Virginia Code § 49-6-3(c) (2009 & Supp. 2012). This statute provides, in pertinent part, that "[t]he parents . . . of the child or children *may* be present at the time and place of application for an order ratifying custody . . . ." *Id.* (emphasis added). This statute further provides that "if at the time the . . . children are taken into custody . . . the worker knows which judge or referee is to receive the application [to ratify emergency custody], the worker shall so inform the parents . . . ." *Id.* The mother argues that the Department worker could have easily ascertained the time and place of the application. The Department asserts that assuming, *arguendo,* that the mother did not receive notice of the hearing, she has failed to show how she was harmed, and that her failure to raise this issue below deprived the circuit court of the opportunity to address it. Further, we note that during the preliminary hearing, the mother stipulated that at the time the children were removed from the home, probable cause existed that they were in imminent danger due to the distribution of pornographic material by the children's stepfather, Jack G., and her failure to protect the children.[19] Thus, under these circumstances, we again find that the mother was not denied due process.

---

[19]These admissions by the mother at the preliminary hearing also dispense with her argument that imminent danger no longer existed at the time the children were removed from the home on December 21, 2011.

With respect to the mother's argument that she was denied due process by the Department's failure to prepare a family functioning assessment and various case plans, we first note that a family functioning assessment is a tool the Department employs to assess the risk to children in a home. Here, as the Department argues, such an assessment became unnecessary when the children were removed from the home due to imminent danger findings made just hours after the Department's investigation began.[20] With regard to the mother's argument that the Department failed to prepare a family case plan under West Virginia Code § 49-6-2(b) (2009) (Supp. 2012), this statute provides, in pertinent part, as follows:

> In any proceeding brought pursuant to the provisions of this article, the court may grant any respondent an improvement period in accord with the provisions of this article. . . . *An order granting such improvement period shall require the department to prepare and submit to the court a family case plan* in accordance with the provisions of section three, article six-d of this chapter.

(Emphasis added). It is clear from this statute that the family case plan requirement is triggered by a court granting an improvement period.[21] Here, as the Department argues, there

---

[20]The Department alleges that, although unnecessary, it ultimately prepared a family functioning assessment when the mother requested one. In preparing the assessment, the Department utilized information from its file concerning the events and its investigation.

[21]At the time these proceedings were instituted, West Virginia Code § 49-6D-3(a) (2009 & Supp. 2012) required the Department to prepare a family case plan within thirty days of an improvement period being granted to a person who had been referred to the Department. Again, here, an improvement period was not granted. While not argued by the parties herein, in 2012, this statute was amended to require the preparation of a "unified child

(continued...)

18

was no need for the Department to prepare a family case plan under West Virginia Code §

49-6-2(b) because no improvement period was granted. Regarding the child's case plan,

West Virginia Code § 49-6-5(a) (2009) (Supp. 2012) provides that following a determination

that a child is abused or neglected,

> the department shall file with the court a copy of the child's case
> plan, including the permanency plan for the child. . . . Copies of
> the child's case plan shall be sent to the child's attorney and
> parent, guardian or custodian or their counsel *at least five days
> prior to the dispositional hearing*.

[Emphasis added]. The Department filed the children's permanency plan the day prior to the

disposition hearing; thus, it was untimely. *Id.* The record reflects that although the mother

was offered a brief continuance given the late filing of this plan, the mother's counsel

advised the circuit court that the mother wished to proceed with the disposition. For this

reason, we find that the mother was not denied due process in the proceedings below.

---

[21](...continued)
and family case plan" within thirty days of a parent being allowed an improvement period
or within sixty days of a child being placed into foster care, whichever occurs first. This
amendment became effective June 7, 2012. The Department's submission of a case plan to
the circuit court on August 13, 2012, substantially complied with the time line in this
amendment. Even assuming, *arguendo*, that it did not, the mother did not object to the plan
submitted on this basis; therefore, she has waived any argument in that regard.

**B. Denial of an improvement period**

Next, the mother asserts that the circuit court erred in denying her an improvement period. As we have previously explained,

> [I]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re: Charity H.*, 215 W.Va. 208, 217, 599 S.E.2d 631, 640 (2004) (quoting *W. Va. Dept. of Health and Human Res. v. Doris S.*, 197 W.Va. 489, 498, 475 S.E.2d 865, 874 (1996)). We have further explained that "an improvement period in the context of abuse and neglect proceedings is viewed as an opportunity for the miscreant parent to modify his/her behavior so as to correct the conditions of abuse and/or neglect with which he/she has been charged." *In re Emily*, 208 W.Va. 325, 334, 540 S.E.2d 540, 551. Under this precedent, in order to remedy the abuse and/or neglect problem, the parent must recognize and acknowledge that his or her conduct constituted abuse. As the circuit court aptly explained during the hearing on the motion for a post-adjudicatory improvement period, "you don't have to have intentional abuse in order to have abuse[,]" and that "being a[n] amenably acceptable parent is more than simply not repeating the same mistakes. It's understanding what it takes to keep them [the children] safe and to keep them healthy."[22]

---

[22]It is clear from our review of the record that the circuit court encouraged the mother
(continued...)

20

In the case at bar, the parties appeared at the first adjudicatory hearing with the understanding that the mother would stipulate to the allegations of abuse and neglect, based upon a stipulation reached among the parties at an MDT meeting, after which the Department would recommend an improvement period. At this hearing, however, the mother refused to follow through with the stipulation. The record similarly reflects that the mother had declined a pre-adjudicatory improvement period because she did not believe that she had done anything inappropriate or anything to cause a need for improvement.

Thereafter, a contested adjudicatory hearing was held. Following the mother being adjudicated as an abusing parent, the circuit court held an evidentiary hearing solely on the mother's motion for a post-adjudicatory improvement period. During this hearing, the circuit court heard the testimony of several witnesses, including that of Dr. Miller, the mother's forensic evaluating psychiatrist. While the mother asserts that the circuit court did not give enough weight to the testimony of Dr. Miller, it is clear from the record Dr. Miller's testimony was fully considered by the circuit court. In fact, the circuit court appointed the mother additional legal counsel, which was one of the very accommodations suggested by Dr. Miller, in an effort to assist her in admitting her issues and making her amenable to the services being offered to her by the Department.

---

[22](...continued)
to put her past experiences with the Department behind her and to recognize that she had failed her children when they were with her.

Under West Virginia Code § 49-6-12(b)(2), the mother was required to prove "by clear and convincing evidence" that she was "likely to fully participate in the improvement period . . . ." *Id.* The mother failed to meet her burden. As the Department argues–and as the record reflects–the mother refused to acknowledge that she had abused her children by allowing Timber to get into a truck with Jack G. in hopes that he would sexually abuse her, again, so that it could be recorded with a cell phone. The mother further refused to acknowledge that she had abused her children by requiring both Timber and Reuben to live with this abuser for another four months *after* the abuse was disclosed. Indeed, the record reflects that instead of recognizing that her failure to protect her children was abuse, the mother persistently blamed others, including law enforcement and the Department.

Based upon the testimony and evidence received at this hearing on the mother's motion for an improvement period, the circuit court found, as discussed previously, that the mother had "failed to demonstrate, by clear and convincing evidence, that she is likely to fully participate in the improvement period[;]" that the mother had "yet to take responsibility for her actions or inactions and acknowledge that her failure to protect the children constituted abuse[;]" and that given the mother's failure to acknowledge the existence of any problem, "granting an improvement period would be futile . . . ."

Upon our review of the record and our prior case law, as discussed above, we find that the mother had a meaningful opportunity to seek an improvement period, but she

22

failed to carry her evidentiary burden under West Virginia Code § 49-6-12(b)(2). Given that the grant of an improvement period is at the discretion of the circuit court,[23] this Court finds no error in the circuit court's denial of an improvement period under the facts and circumstances of this case.

## C. Termination of parental rights

The mother argues that the circuit court committed error in terminating her parental rights because neither the circuit court nor the Department considered any alternatives less restrictive than termination. She further argues that because there was no finding of aggravated circumstances following adjudication, the Department was not relieved of its duty to work toward reunifying the family. Conversely, the Department argues that the circuit court correctly found that there was no less restrictive disposition than termination because the mother could not provide the children with the safety and security they need. The Department adds that the circuit court did consider a less restrictive alternative–i.e., an improvement period–and held an evidentiary hearing specifically to address the mother's motion for the same.[24]

---

[23]West Virginia Code § 49-6-2(b) provides, in relevant part, that "the court *may* grant any respondent an improvement period in accord with the provisions of this article." (Emphasis added).

[24]We also observe from the record that while the mother had initially sought a post-dispositional improvement period, she retreated from that position during the disposition hearing when her counsel advised the circuit court that it was "not [the mother's] intention today to ask for a dispositional improvement period . . . ." He later argued that "ideally, yes,
(continued...)

We have previously observed that the "'"'"[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W.Va. Code, 49-6-5 [1977][,] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W.Va. Code, 49-6-5(b) [1977] that conditions of neglect or abuse can be substantially corrected.' Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syllabus point 4, *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989).' Syl. Pt. 1, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993)." Syl. Pt. 6, *In re Isaiah A.*, 228 W.Va. 176, 718 S.E.2d 775 (2010). Further, "'courts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened . . . .' Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syl. Pt. 4, in part, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873. Moreover, under West Virginia Code § 49-6-5(a)(6), courts are directed to terminate an abusing parent's parental rights "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child . . . ." *Id.*

---

[24](...continued)
she'd like the petition dismissed and she'd like her children returned to her . . . . Realistically, the plan we would suggest to the Court is somewhat similar to the department's permanency plan. The Court return the children to [Kevin M.]." Counsel then asked that the circuit court "simply terminate the physical custody rights and visitation rights, not an absolute termination of parental rights." The Department's counsel responded that permanency would not be achieved short of a full termination of parental rights.

In the case *sub judice*, the circuit court found in its disposition order that the mother "has failed to recognize that she failed to protect her children and that she does not have the capacity to recognize and remedy that failure in the near future." The circuit court further found that the Department had "made reasonable efforts, with the children's health and safety being the paramount concern, to preserve the family" and had made reasonable efforts "to prevent removal and to promote reunification . . . ." In addition, the circuit court found that "[t]here is no reasonable likelihood that the conditions of abuse can be substantially corrected in the near future and the children need continuity in care and caretakers, and a significant amount of time is required to be integrated into a stable and permanent home environment." The circuit court concluded that "[b]ased upon necessity for the welfare and best interests of the children . . . the parental rights of [the mother] are terminated."

Upon our review of the record, as discussed above, we find that the circuit court was presented with sufficient evidence upon which to base its findings that there was no reasonable likelihood to believe that conditions of abuse and neglect could be substantially corrected in the near future and that termination was necessary for the children's welfare. The record reflects that the mother, through her words, action and inaction, demonstrated an intractable unwillingness and inability to acknowledge her culpability in this matter, to accept the services offered by the Department, and to protect her children in the

25

future.  Accordingly, we find no clear error in the circuit court's termination of the mother's parental rights to Timber M. and Reuben M. under the facts and circumstances of this case.

### D.  Custody of the children

In the circuit court's dispositional order entered August 16, 2012, the circuit court granted both physical and legal custody of Timber M. and Reuben M. to their biological father, Kevin M.   Based upon our review of the record, we find that placement to be extremely troubling, as explained below.

The record in this case indicates that between 2004 and 2011, during which the mother and Kevin M. were involved in a custody dispute concerning Timber M. and Reuben M., there were thirteen referrals to CPS involving these children, at least eight of which the mother instituted or caused to be instituted against Kevin M.  These referrals contained allegations that Kevin M. sexually abused Timber M., beat one or both of the children, and allowed the children's head lice to go untreated.  With regard to those specific allegations, the Department investigated and determined that they were "not substantiated."

In addition to the unsubstantiated allegations, the record does contain substantiated allegations of sexual abuse by Kevin M.  The record contains a CPS social summary filed in the circuit court which indicates that Kevin M. had been accused of "sexual abuse on more than one occasion and with more than one victim[,]" and that when questioned

26

about the matter, he "stated that every time he gets divorced or separated, someone accuses him of sexual abuse." One such instance involved a CPS referral in June of 2008 alleging that Kevin M. had been sexually abusing his then-stepdaughter, M.B., who was twelve years old at the time. The record reflects that these allegations, which involved Kevin M. fondling M.B.'s breasts and digitally penetrating her vagina two to three times a week, **were substantiated**. At the time, M.B. described Kevin M.'s digital penetration as being "so hard" that she felt that his finger "would come out her butt." The record further indicates that when Kevin M. was questioned concerning these allegations, **"he did not recall"** touching M.B.'s vagina and refused to take a polygraph examination. Subsequently, these allegations became the subject of an indictment returned against Kevin M. on February 2, 2010, charging him with two counts of third degree sexual assault, two counts of sexual abuse by a parent, guardian, custodian or person in a position of trust to a child, and two counts of incest, each count naming M.B. as his victim.[25] *See State v. Kevin Dale M.*, Case No. 10-F-6.

This criminal proceeding against Kevin M. was referenced in the Department's abuse and neglect petition when the Department stated that it was considering the possibility of placing the children with their biological father, Kevin M., "upon further assessment of criminal charges" pending against him. On December 22, 2011, the same day the initial abuse and neglect petition was filed, the indictment against Kevin M. was dismissed on the

---

[25]The reason or reasons for the delay in the filing of these criminal charges following the CPS referral in 2008 are not set forth in the record.

motion of the prosecutor, who stated simply that "the State no longer wishes to prosecute."[26]

In the Department's amended petition, also filed on December 22, 2011, the Department

alleged that these criminal charges were dismissed "due to the victim not wishing the matter

to proceed further, and due to certain other considerations of the Prosecuting Attorney's

Office."[27]  These same criminal charges were referenced by Kevin M.'s counsel during the

hearing on the mother's motion for a post-adjudicatory improvement period when he implied

that the criminal charges were dismissed against Kevin M. to pave the way for the children

to be placed into his physical custody:

> My client was first called to [the Department] when these
> children were picked up and told to come and get your children.
> Well, then somebody apparently looked at the allegations that
> had been made against him and said, no, wait a minute, we've
> got to get this off your record . . . . And the prosecutor granted
> a quick dismissal and we got an order to do that.  Then he was
> told, no, you can't have the children unless you go with your
> parents.

Significantly, although the criminal charges were dismissed by the circuit court, there is

absolutely no indication in the record that M.B. ever retracted her allegations against Kevin

M.

In addition to the specific allegations against Kevin M., the Department's

amended petition also alleged that Kevin M. was minimizing the mother's culpability in the

---

[26]The only information from this criminal action in the record is a copy of the indictment against Kevin M. and the circuit court's order dismissing that criminal action.

[27]The record is silent as to what these "certain other considerations" might be.

abuse and neglect matter, despite having first-hand knowledge that the mother had left the children for more than four months with their stepfather, Jack G., after knowing that Jack G. was exposing himself to Timber and showing her pornographic materials.[28] In fact, during the eight-month period that the abuse and neglect proceedings against the mother were litigated, all of the social summary notes and case report notes in the record indicate that Kevin M. continued to minimize the mother's culpability and, therefore, he *"would not [be expected to] play a protective role"* with respect to the children. These same summaries and reports further indicate that Kevin M. did not want custody.[29]

Thereafter, the record is silent as to why the Department recommended that Kevin M. be granted custody of Timber and Reuben, particularly when the children were, by all accounts, doing well in a foster placement. Although there might be pertinent

---

[28]All of the information in the record indicates that after the mother and Kevin M. moved past the child custody proceedings following their separation, they became "quite friendly" and often went hunting together, including during the four-month period in which the mother allowed Jack G. to continue to live in the home.

[29]While Kevin M. did not want custody, he did want visitation. In the circuit court's order entered following the preliminary hearing, it referred Kevin M.'s request for visitation, and the decision as to whether such visitation should be supervised, to the MDT. Apparently Kevin M. was granted supervised visitation because the record contains a report of the MDT meeting held on August 8, 2012, which states, in part, that "[t]he team . . . decided to no longer have [Kevin M.] be supervised with his children [and] that he can take them out in his vehicle alone and do different activities without the supervision of his parents." However, this Court could not find any discussion in any of the MDT meeting reports in the record regarding the prior sexual abuse allegations against Kevin M., nor any explanation for the MDT's decision to allow Kevin M. to have supervised visitation, nor any explanation for the MDT's decision that the visitations no longer needed to be supervised.

information in the children's permanency plan, that document is not in the record.[30]  Finally, there is nothing in the circuit court's dispositional order to suggest when, and why, Kevin M. decided to accept custody, or when, and why, the Department decided that was a good idea. Regrettably, the Department's counsel was unable to assuage this Court's concerns when questioned about this placement during oral argument other than to suggest, as did the GAL, that this placement was the result of the Department's inability to "prove" the allegations against Kevin M. in the context of the instant proceeding.  Of course, there is also nothing in the record to indicate that anyone talked to either the prosecutor or the victim in *State v. Kevin Dale M.*, or reviewed the discovery in that case, or otherwise made any attempt to ascertain the "certain other considerations" that led to the case being dismissed two years after it was instituted, other than the aforementioned statements made by Kevin M.'s counsel.

While the custodial placement for the children is not an issue raised in this appeal, this Court cannot ignore the alarming information in the record concerning Kevin M. As indicated above, this Court is unable to glean from either the record or the circuit court's dispositional order why the children's placement with the biological father was deemed appropriate in light of the information in the record concerning the father.  As we have previously stated, "[w]ithout factual or legal findings, this Court is greatly at sea without a chart or compass in making a determination as to whether the circuit court's decision was

---

[30]While Rules 39 through 46 of the Rules of Procedure for Child Abuse and Neglect Proceedings contemplate permanent placement reviews and the entry of additional orders following these reviews, if any of this has occurred, that information is also not in the record.

right or wrong." *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 228 W.Va. 646, 689, 724 S.E.2d 250, 293 (2011) (internal citations omitted). This is the position in which this Court now finds itself.

Although our general rule is that issues not raised on appeal will not be considered, Rule 2 of the West Virginia Rules of Appellate Procedure specifically provides, as follows:

> In the interest of expediting decision, or for other good cause shown, the Supreme Court may suspend the requirements or provisions of any of these Rules in a particular case on application of a party or on its own motion and may order proceedings in accordance with its direction. These Rules shall be construed to allow the Supreme Court to do substantial justice.

With similar considerations, Rule 2 of the Rules of Procedure for Child Abuse and Neglect Proceedings provides, in pertinent part, that "[t]hese rules shall be liberally construed to achieve safe, stable, secure permanent homes for abused and/or neglected children[,]" and further provides that "[t]hese rules are not to be applied or enforced in any manner which will endanger or harm a child."

Thus, it is clear from our procedural rules, as well as our prior case law, that "[t]here cannot be too much advocacy for children." *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 570, 490 S.E.2d 642, 657 (1997) (Workman, C.J., concurring). Indeed, if one thing is firmly fixed in our jurisprudence involving abused and neglected children, it is that

31

the "polar star test [is] looking to the best interests of our children and their right to healthy, happy productive lives[.]" *In re Edward B.*, 210 W.Va. 621, 632, 558 S.E.2d 620, 631 (2001). This Court has repeatedly stated that a child's welfare acts as "the polar star by which the discretion of the court will be guided." *In Re: Clifford K.*, 217 W.Va. 625, 634, 619 S.E.2d 138, 147 (2005) (internal citation omitted). *See also In re D.P.*, 230 W.Va. 254, __737 S.E.2d 282, 285 (2012) ("It is axiomatic that, in any contest involving the care and custody of a minor, 'the welfare of the child is the polar star by which the discretion of the court will be guided.' Syllabus Point 2, *State ex rel. Lipscomb v. Joplin*, 131 W.Va. 302, 47 S.E.2d 221 (1948).").

With these guiding principles in mind, this Court has previously addressed matters not raised in the appeal of cases involving the welfare of children. *See In re Jonathan Michael D.*, 194 W.Va. 20, 27, 459 S.E.2d 131, 138 (1995) ("On the issue of the improvement period, we *sua sponte* address an issue of particular concern to this Court."); *In re Jamie Nicole H.*, 205 W.Va. 176, 183, 517 S.E.2d 41, 48 (1999) ("While Appellant has not raised the sufficiency of the trial court's dispositional order, we address this issue *sua sponte*."). *Cf. In re K.R.*, 229 W.Va. 733, __ n. 23, 735 S.E.2d 882, 893 n. 23 (2012) ("While neither party assigned this specific ruling as error, this does not affect this Court's ability to determine it to be error: '[I]t is within the authority of this Court to "sua sponte, in the interest of justice, notice plain error." *Cartwright v. McComas*, 223 W.Va. 161, 164, 672 S.E.2d 297, 300 (2008) (quoting Syl. Pt. 1, in part, *State v. Myers*, 204 W.Va. 449, 513

S.E.2d 676 (1998)."));[31] *Ringer v. John*, No. 11-1325 (W.Va. April 2, 2013) (Court deciding case on the basis of an issue not raised by the parties).[32]

Based on our prior precedent and firmly rooted in this Court's concern for the well-being of children, we now hold that in cases involving the abuse and neglect of children, when it appears from this Court's review of the record on appeal that the health and welfare of a child may be at risk as a result of the child's custodial placement, regardless of whether that placement is an issue raised in the appeal, this Court will take such action as it deems appropriate and necessary to protect that child. Such action may include vacating the circuit court's order of disposition with respect to the custodial placement, remanding the case for further proceedings, and directing the entry of an order fully explaining the propriety of the custodial placement. The thoroughness of such an order becomes extremely important if a circuit court were to determine on remand that its initial custodial placement was, in fact, appropriate.

---

[31]Similarly, Rule 10(c)(3) of the West Virginia Rules of Appellate Procedure provides, in relevant part, that "[i]n its discretion, this Court may consider a plain error not among the assignments of error but evident from the record and otherwise within its jurisdiction to decide."

[32]*See also* 5 Am. Jur. 2d Appellate Review § 762 (recognizing the power of appellate courts to remand cases for further proceedings "where justice demands that course in order that some defect in the record may be supplied; such a remand may be made to permit further evidence to be taken or additional findings to be made upon essential points. (Internal citation omitted).").

In reviewing the record submitted by the parties in the case at bar, there is a glaring evidentiary gap that leaves this Court with the firm conviction that no one in the proceedings below adequately considered the issue of Kevin M.'s fitness to have custody of Timber M. and Reuben M.[33]  *Cf.* Syl. Pt. 1, in part, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996) ("A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.").  Accordingly, we remand this case to the circuit court for further proceedings to determine whether permanent custodial placement of the children with Kevin M. is appropriate and for the entry of an order that fully explains the propriety of the custodial placement.

## IV.  Conclusion

Based upon this Court's thorough review of this matter and for the foregoing reasons, the order of the Circuit Court of Greenbrier County entered on August 16, 2012, is affirmed with regard to the termination of the petitioner's parental rights to her children, Timber M. and Reuben M., but vacated with regard to custodial placement.  This case is remanded for further proceedings to determine whether permanent custodial placement of

---

[33]While there are various comments in the record as to the Department's services being in place to assist the father, Kevin M., those services appear to be directed to the father's reluctance and concern in assuming full-time responsibility for his children, as opposed to services related to his history of sexual abuse allegations involving children.

34

the children with Kevin M. is appropriate.[34]  To facilitate the commencement of the proceedings on remand, the Clerk is directed to issue the mandate of the Court contemporaneously with the issuance of this opinion.

Affirmed, in part, Vacated, in part, and Remanded with Directions.

---

[34]In light of our decision today, the Department should immediately take all necessary actions to ensure the safety and welfare of both Timber M. and Reuben M.