**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **V.T., S.T., T.T., and S.B.**

**No. 22-627** (Harrison County 21-JA-203-2, 21-JA-204-2, 21-JA-205-2, and 21-JA-207-2)

**MEMORANDUM DECISION**

Petitioner Mother and Stepmother P.T.[1] appeals the Circuit Court of Harrison County's June 22, 2022, order terminating her parental and custodial rights to V.T., S.T., T.T., and S.B.[2] Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

In September of 2021, the DHHR filed a petition against petitioner (the mother of S.B. and stepmother of V.T., S.T., and T.T.) and J.T. (the father of V.T., S.T., and T.T. and stepfather of S.B.) alleging that the couple failed to protect the children from the children's adult stepbrother/half-brother's (Z.D.) sexual abuse. In late August of 2021, S.T. ran away from home, was located by police, and disclosed Z.D.'s sexual abuse of the children during a child advocacy center ("CAC") interview. Then-fifteen-year-old S.T. (1) disclosed that Z.D.'s sexual abuse started when she was thirteen years old and (2) alleged that the family moved from New York to three different counties in North Carolina and then to West Virginia to evade child welfare authorities.[3] She stated that petitioner was fully aware of the abuse, as she had walked in on instances of Z.D. inappropriately touching his siblings. S.T. also reported that when she told petitioner and J.T. about the abuse they refused to believe her or acknowledge the abuse. The DHHR further alleged that petitioner and J.T. emotionally abused the children by insulting them and calling them vulgar names; that J.T excessively punished the children by beating them with a belt; and that petitioner threw objects, like shoes, at the children.

---

[1]Petitioner appears by counsel Allison S. McClure. The West Virginia Department of Health and Human Resources ("DHHR") appears by counsel Attorney General Patrick Morrisey and Assistant Attorney General Katica Ribel. Dreama Sinkkanen appears as the children's guardian ad litem.

[2]We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

[3]The children ranged in age from ten to sixteen years old when the petition was filed. Z.D. is petitioner's son from a prior relationship.

The circuit court held contested adjudicatory hearings in October and December of 2021 and April of 2022. Petitioner denied that she or J.T. ever struck the children. She further testified that the family had strict rules that the male children could not be upstairs where the girls' rooms were located, and the girls could not be in the boys' room in the basement. She elaborated that the siblings of opposite sex were not allowed to touch each other. When questioned about prior child welfare services involvement in North Carolina, petitioner admitted that there were reports in 2019 about her son Z.D.'s sexual misconduct with the other children. She stated that North Carolina did not file a case against the family and that she did not believe Z.D. harmed the other children. She claimed that none of the children had disclosed any abuse to her.

The DHHR worker testified that he was present during S.T.'s CAC interview and his description of S.T.'s allegations were consistent with the petition. The DHHR moved for the admission of several exhibits concerning prior child protective services involvement with the family in New York and North Carolina spanning from 2010 to the present. The allegations included a lack of supervision, Z.D.'s sexual misconduct, petitioner's sexually explicit social media accounts, and that two of the children watched pornography on a public library's computer.

The forensic interviewer testified that all the children were interviewed at the CAC in early August of 2021, but none disclosed sexual abuse at that time. However, during the interviews, V.T. revealed that petitioner smashed S.T.'s cellphone after an argument. S.B. disclosed being afraid when petitioner and J.T. "had fights." T.T. stated that the family had moved to several places but denied any abuse. S.B. reported that Z.D. had sex with a cousin in North Carolina but denied that Z.D. sexually abused her. In this interview conducted a few weeks before S.T. ran away from home, S.T. did not disclose sexual abuse but instead disclosed allegations of domestic violence, such as petitioner attempting to run J.T. over with a car and holding a knife to him. She also reported that J.T. struck Z.D., causing him to fall to the ground, and confirmed that petitioner purposefully broke S.T.'s cellphone.

The interviewer further testified that during a subsequent CAC interview with S.T. taken after she ran away, S.T. recanted her prior statement that she did not know anything about sexual abuse by Z.D. S.T. admitted that she lied because her aunt was waiting in the lobby and could hear what she said. She also said that Z.D. was sending her threatening texts during the first CAC interview. S.T. stated that petitioner told the children they would move out of West Virginia if Z.D. got into trouble for his sexual misconduct. S.T. described several incidents in which Z.D. sexually abused her, V.T., and S.B. She stated that during a month that the children were left alone while petitioner and J.T. were "on the road" driving a truck, V.T. caught Z.D. having oral sex with his half-sister S.B. S.T. stated that she called J.T. and told him about the incident but that he did not believe her. She also told the interviewer that petitioner deleted a video on a personal device of Z.D. forcing T.T. to "dry hump" him. When describing an incident where Z.D. forced her to put her hand in his pants, S.T. said Z.D. told her, "It's not like we are biological siblings." Finally, S.T. disclosed that J.T. struck her across the face and that she had seen J.T. slap petitioner.

At a status hearing in January of 2022, the court announced that it conducted an in camera interview of S.T. the day prior and that S.T.'s statements were consistent with those made in her second CAC interview disclosing extensive sexual, physical, and emotional abuse in the home. In the final adjudicatory order, the court found that "there was a plan and concerted effort to

intimidate these children and secure their silence." The court summarized the concerning pattern of various referrals made since 2015 regarding lack of supervision of the children and sexual abuse in the home, including referrals from family members who directly witnessed Z.D. sexually abusing S.B. The court further found that petitioner and J.T. moved the children "from place to place when [Z.D.'s] behaviors were discovered and investigated." It also determined that petitioner and J.T. were not truthful about the number of referrals though the years, including the numerous referrals in New York. Based on the evidence, the court found that petitioner and J.T. knew that the children were being sexually abused but chose to protect Z.D. from prosecution. The court further found that J.T. physically abused S.T. and V.T. and that petitioner and J.T. chronically emotionally abused all of the children. Accordingly, the court adjudicated petitioner as an abusing parent.

Petitioner filed a motion for a post-adjudicatory improvement period in May of 2022. That same month the circuit court held a contested dispositional hearing, during which the court took judicial notice of all prior evidence. Petitioner testified that she had been cooperating with the DHHR's services and admitted that she could have supervised the children more. She stated that she remained unconvinced that Z.D. was sexually inappropriate with the children and that S.T. lied about all of the allegations. A service provider testified that several of the children did not want to visit with petitioner and J.T., and that petitioner would entice the children to visit by providing Easter baskets and toys and bringing the family pets. The provider stated that the children were afraid to decline visits. The provider explained that during visits, petitioner gave baby dolls to the teenage female children, "infantilized" the children, and brought her own baby doll, which she strapped in a car seat and referred to it as the children's brother. The DHHR worker testified that all of children but S.B. wanted to remain in their placements and not be returned to petitioner and J.T.

The court's dispositional order specifically provides that petitioner "maintains that the sexual abuse of the children previously found by this court is a false accusation." The court found that the DHHR was relieved of its duty to make reasonable efforts to reunify the family due to the "severity of the abuse" and petitioner and J.T.'s "failure to take any responsibility for said abuse." The court concluded that there was no reasonable likelihood that the conditions of abuse and neglect could be corrected in the near future and that termination of petitioner's parental and custodial rights was necessary for the children's welfare. Consequently, the court terminated petitioner's parental and custodial rights by order entered on June 22, 2022.[4]

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). First, petitioner argues that the circuit court erred in adjudicating her as an abusing parent based on sexual abuse. However, the DHHR never alleged that she sexually abused the children. Rather, the court focused on petitioner's failure to protect the children and their lack of supervision. *See* W. Va. Code § 49-1-201 (defining "neglected child," in part, as one who is harmed or threatened by a parent's "failure . . . to supply the child with

---

[4]The parental rights of the father of V.T., S.T., and T.T. were terminated. The permanency plan for these children is adoption by the paternal grandmother. The father of S.B. voluntarily relinquished his parental rights. S.B.'s permanency plan is adoption by her foster family.

3

necessary . . . supervision"). Although petitioner claimed that the male children and female children lived in separate living spaces, and thus, would be protected from sexual abuse such as that from Z.D., petitioner clearly failed to act to ensure that no abuse would occur. Petitioner did not remove Z.D. from the home and continued to ignore S.T.'s and the other children's disclosures about Z.D.'s sexual contacts. Further, S.T. stated that petitioner walked in on Z.D. inappropriately touching his siblings. Additionally, the Court has reasoned:

> for a child to be determined to be an "abused child," the parent charged with such abuse need not commit the abuse him/herself, so long as he/she knew that the subject abuse was being perpetrated, even if the alleged abuse occurs outside of the presence of the parent charged with such abuse.

*In re A.M.*, 243 W. Va. 593, 601, 849 S.E.2d 371, 379 (2020) (citations omitted). As such, we find that petitioner is entitled to no relief in this regard.

Likewise, petitioner's argument that the court erred in adjudicating her as an abusing parent based upon emotional and physical abuse and/or domestic violence lacks merit. Petitioner concedes in her brief on appeal that J.T. struck S.T. and emotionally abused her by saying he did not want her. The record also reveals numerous other incidents of emotional abuse as J.T. admitted to his strict upbringing of the female children and S.T. and another witness testified that petitioner called the children vulgar names, threw shoes at them, and intentionally broke their personal property. S.T. reported both during her second CAC interview and her in camera interview that she feared being harmed by petitioner and J.T. if they learned of her reports about the abuse and neglect in the home. Additionally, several of the children described the parents' fights and arguments in their CAC interviews. There is extensive evidence that the children suffered from years of emotional and mental abuse as the parents systematically silenced them to protect the adult sibling, Z.D. *See* W. Va. Code § 49-1-201 (defining "abused child," in part, as one who is harmed or threatened by a parent who "intentionally inflicts . . . physical, mental, or emotional injury, upon the child or another child in the home"). The evidence below supports petitioner's adjudication under a clear and convincing standard. *See id.* § 49-4-601(i) (requiring a circuit court to find, "by clear and convincing evidence," that a parent has abused and/or neglected a child at the conclusion of the adjudicatory hearing); *In re F.S.*, 233 W. Va. 538, 546, 759 S.E.2d 769, 777 (2014) (explaining that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established"). The evidence against petitioner was overwhelming, and we find no error in the circuit court's adjudication of petitioner as an abusing parent.

Petitioner also argues that the circuit court erred in denying her an improvement period. Petitioner cites her cooperation with services and alleged willingness to fully participate in an improvement period. *See* W. Va. Code § 49-4-610(2). However, petitioner's refusal to acknowledge the conditions of abuse and neglect render the granting of an improvement period useless. We have previously held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator

4

of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). As such, the circuit court did not err in denying petitioner an improvement period.

Lastly, petitioner argues that the circuit court erred in terminating her parental rights. Upon our review, we find no error. No reasonable likelihood that the conditions of abuse and neglect can be corrected includes when

[t]he abusing parent or parents have repeatedly or seriously injured the child physically or emotionally, or have sexually abused or sexually exploited the child, and the degree of family stress and the potential for further abuse and neglect are so great as to preclude the use of resources to mitigate or resolve family problems, or assist the abusing parent or parents in fulfilling their responsibilities to the child[.]

W. Va. Code § 49-4-604(d)(5). Here, the facts bear out that the children suffered emotional, mental, physical, and sexual abuse for years while in the parents' care and that three of the four children no longer wish to live with petitioner or J.T.[5] Petitioner failed to acknowledge the conditions of abuse and neglect, which also supports the court's finding that termination was necessary to protect the children from further abuse. Accordingly, we find no error in the circuit court's decision to terminate petitioner's parental and custodial rights to the children. *See also* Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011) (holding that "[t]ermination of parental rights . . . may be employed . . . when it is found that there is no reasonable likelihood . . . that the conditions of neglect or abuse can be substantially corrected").

For the foregoing reasons, we find no error in the decision of the circuit court, and its June 22, 2022, order is hereby affirmed.

Affirmed.

**ISSUED**: May 16, 2023

**CONCURRED IN BY**:

Chief Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton
Justice C. Haley Bunn

---

[5]Petitioner concedes that the children's preferences must be considered due to their age, and that the children (minus S.B.) did not wish to return to petitioner and J.T. *See* W. Va. Code § 49-4-604(c)(6)(C) ("the court shall give consideration to the wishes of a child 14 years of age or older or otherwise of an age of discretion as determined by the court regarding the permanent termination of parental rights").

5