# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

*In re* **C.D.-1 and L.L.**

**No. 21-0334** (McDowell County 19-JA-17 and 19-JA-18)

## MEMORANDUM DECISION

Petitioner Mother K.W.-1, by counsel Zachary K. Whitten, appeals the Circuit Court of McDowell County's March 26, 2021, order terminating her parental rights to C.D.-1 and L.L.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and S.L. Evans, filed a response in support of the circuit court's order. The guardians ad litem, Monica Oglesby Holliday and Zoey Vilasuso,[2] filed a response on behalf of the children in support of the circuit court's order and a supplemental appendix. Respondent Father C.D.-2, by counsel R. Keith Flinchum, filed a response in support of the circuit court's order. Finally, Respondent Maternal Grandmother K.W.-2, by counsel Paige Flanigan, filed a response in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating her parental rights because she did not fail to protect the children, denying her motions for post-adjudicatory and post-dispositional improvement periods, and failing to impose a less-restrictive dispositional alternative.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons,

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because one of the children and one of the fathers share the same initials, we will refer to them as C.D.-1 and C.D.-2, respectively, throughout this memorandum decision. Lastly, because petitioner and the maternal grandmother share the same initials, we will refer to them as K.W.-1 and K.W.-2, respectively, throughout this memorandum decision.

[2]Zoey Vilasuso, an eligible law student, was permitted to participate in the filing of the guardian's brief pursuant to Rule 10 of the West Virginia Rules for Admission to the Practice of Law.

a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

The facts underlying the instant proceedings are detailed and encompass multiple related proceedings. Prior to the DHHR's filing of the abuse and neglect petition that gave rise to this particular cause of action, the circuit court presided over a prior abuse and neglect proceeding involving C.D.-1 and petitioner in 2018.[3] According to the record, that prior matter involved C.D.-1 displaying bruising to her face when dropped off with her grandparents, after which C.D.-2 took the child to the hospital and contacted the West Virginia State Police. Petitioner told Child Protective Services ("CPS") that the bruises came from the child falling and hitting a doorway and from when a box fell on her head. Petitioner also claimed that the child's medical records would reveal a condition that caused the child to bruise easily, but CPS's investigation revealed no such records. Petitioner was granted a pre-adjudicatory improvement period in that matter, and the petition was later dismissed without objection upon petitioner's compliance with services. The circuit court further noted that there was insufficient evidence to determine what caused the child's injuries in that matter. Following dismissal of that petition, the child was returned to the parent's shared custody pursuant to their agreed schedule. The DHHR was also ordered to provide services following dismissal.

Thereafter, a family court matter was initiated in which C.D.-1's father filed an emergency petition for allocation of custodial responsibility upon allegations that C.D.-1 suffered abuse while in the care of petitioner and the father of L.L. The family court, however, found that "it could not relitigate the issues" from the prior abuse and neglect proceeding, despite its "concerns regarding the allegations of domestic violence" between petitioner and L.L.'s father. The family court's order set forth a shared joint custody agreement for the parties concerning C.D.-1.

Less than two months after the family court entered its order, two-year-old C.D.-1 was admitted to Welch Community Hospital and then later transferred twice before ultimately being admitted to Charleston Area Medical Center Women's and Children's Hospital. As alleged in the DHHR's initial petition from May of 2019, petitioner's live-in boyfriend, L.L.'s father, called petitioner at her place of employment on May 9, 2019, and told her the child was not "acting right." While in the hospital, the child was cold and lethargic and a CT scan revealed "a brain bleed from being shaken." The DHHR also alleged that the child had a bite mark on her tongue. Upon an ophthalmological examination, the child was found to have bilateral retinal hemorrhages, which indicated shaken baby syndrome. Petitioner reported that the child had visited with her father for the four days prior to the hospitalization and was sick while at his home. Petitioner indicated that since the child's return, she had been acting more tired and had a decreased appetite. Ultimately, the DHHR alleged that the child was shaken while in the custody of L.L.'s father but stated that the perpetrator was unknown because of petitioner's allegations that the child had been acting ill for at least four days longer.

On May 28, 2019, the DHHR filed an amended petition to include an additional child who is not at issue on appeal. According to the amended petition, this child witnessed petitioner and

---

[3]C.D.-1's father joined as a co-petitioner with the DHHR in that prior matter.

L.L.'s father engaged in domestic violence. The child described L.L.'s father choking petitioner. Following the filing of these petitions, petitioner waived her right to a preliminary hearing. It was later determined that C.D.-1's father was, in fact, a nonabusing parent, as medical records confirmed that the child suffered from cold-like symptoms while in his care but did not exhibit any serious symptoms of traumatic injury until after she was returned to petitioner's care.

Thereafter, the adjudicatory hearing was continued multiple times due to the unavailability of witnesses and other factors. In August of 2020, the court held the adjudicatory hearing, during which it heard testimony from Dr. Sharon L. Istfan, who treated C.D.-1 upon admission to the hospital; CPS workers Lindsey Morgan, Regina Mullins, and Morgan Sutphin; petitioner; and petitioner's neighbor, H.P.

Dr. Istfan testified to her extensive medical qualifications, including her specialization in child abuse and neglect. According to Dr. Istfan, imaging scans revealed that the child had a brain bleed, and the child was reported to be unresponsive after allegedly suffering a seizure. According to Dr. Istfan these symptoms were indicative of an abusive injury. Based on the child's multiple examinations and various injuries, Dr. Istfan concluded that she suffered a shaking rotational injury, especially considering that the child had no skull fracture. According to Dr. Istfan, there was no other medical cause for the child's condition. Dr. Istfan also explained that the child's cold-like symptoms could not have elevated to the condition the child exhibited when presented to the hospital, and that the child had to have suffered the underlying injuries less than seventy-two hours prior to her presentation for treatment—a timeframe that excluded C.D.-1's father as a perpetrator. Finally, based on statements from petitioner and L.L.'s father, Dr. Istfan concluded that C.D.-1 was shaken at the approximate time that L.L.'s father reported to petitioner that the child had a seizure, as the child going limp from a previously alert status is usually when the child has been shaken.

During petitioner's testimony, she explicitly denied that physical violence ever occurred in the home and specifically claimed that the child who described witnessing physical violence had lied. The court found this testimony lacked credibility. Petitioner also testified that she did not believe C.D.-1 was the victim of shaken baby syndrome until she heard Dr. Istfan's testimony during this hearing. She claimed that "the medical records and facts were 'jumbled around,' and that there was a lack of communication regarding [C.D.-1's] condition." She admitted, however, that there was a "possibility" that the hospital staff informed her that the child was the victim of shaken baby syndrome. Petitioner then testified that "in [her] heart" she did not believe that L.L.'s father injured C.D.-1 and that she could not prove he did so. Petitioner claimed that she did not know who injured the child because she did not personally observe the injury yet admitted that no other adult besides L.L.'s father was in the home when the child sustained the injuries. Further, when asked if she would be willing to leave L.L.'s father if it meant returning her children to her care, petitioner responded "absolutely not."

Based on the evidence, the court found that C.D.-1 was the victim of shaken baby syndrome and that the only adult present at the time of the child's injury was L.L.'s father. The court further found that petitioner failed to protect the children from L.L.'s father. Finally, the court found that L.L.'s father committed physical acts of domestic violence against petitioner. Petitioner moved

orally for a post-adjudicatory improvement period during the hearing, which the circuit court took under advisement.

Following the adjudicatory hearing, the DHHR filed case plans that indicated petitioner and L.L.'s father continued to live together. Prior to the dispositional hearing, petitioner filed a formal motion for a post-adjudicatory improvement period. Petitioner also filed a sworn and notarized stipulation in which she stipulated to the conditions of abuse and neglect contained in the petitions despite the fact that the court already held a contested adjudicatory hearing and made findings in regard to her abuse and neglect of the children.

On March 5, 2021, the court held a dispositional hearing, during which petitioner again moved for a post-adjudicatory improvement period. The DHHR presented testimony from a CPS worker who stated that she had seen no improvement in the conditions of abuse and neglect. According to this CPS worker, petitioner stated on multiple occasions that she would leave L.L.'s father, yet only one week prior to the dispositional hearing the mother stated at a multidisciplinary team ("MDT") meeting that she was still in a relationship with him and was, in fact, pregnant with his child. The CPS worker nonetheless testified that petitioner "very recently ended her relationship with [L.L.'s father] and moved to Virginia." The CPS worker also indicated that petitioner never acknowledged any wrongdoing to her during the proceedings. However, a service provider testified to petitioner's conflicting statements regarding her relationship with L.L.'s father, as petitioner sent the service provider a text message one week before the dispositional hearing stating that petitioner had L.L.'s father move out of their shared home. The service provider also testified that petitioner attended a telephonic MDT meeting on February 26, 2021, with L.L.'s father and that petitioner and L.L.'s father "were always together for parenting sessions." Further, the provider testified that during the recent MDT meeting, petitioner stated "that she did not believe [L.L.'s father] injured her daughter even after she received the . . . adjudicatory order and . . . questioned if her daughter was truly the victim of shaken baby syndrome." This is despite the fact that the provider "spent at least two . . . parenting sessions attempting to educate [petitioner] . . . regarding shaken baby syndrome" and that "the [c]ourt's adjudicatory order was discussed 'point by point.'" The provider also testified that petitioner denied domestic violence in the home. Finally, the provider testified that she would have serious concerns for the children's safety if returned to the care of petitioner and L.L.'s father.

Petitioner also testified, initially indicating that she believed L.L.'s father injured C.D.-1, but, as the circuit court found, "later back peddled in her testimony and maintained she did not personally observe [L.L.'s father] shake her daughter and that she 'had to have proof.'" Petitioner claimed to have ended her relationship with L.L.'s father and that she stopped residing in the home with him on February 26, 2021.

Based on the evidence, the court found that despite having repeatedly stated that she would end her relationship with L.L.'s father, petitioner refused to do so until one week prior to the dispositional hearing. Further, the court found that petitioner stated that she would be willing to file a domestic violence petition against L.L.'s father but that she never did so. According to the court, petitioner acknowledged that L.L.'s father lived in her home and that she could have instructed him to leave at any time. The court further reiterated that petitioner either knew or should have known that L.L.'s father's explanation for C.D.-1's injuries was not supported by the facts

4

and evidence submitted in the case. The court also noted that petitioner's testimony regarding whether she believed C.D.-1 suffered shaken baby syndrome deviated throughout the case. Taking all her testimony into consideration, the court found that petitioner's "apparent willful blindness and claimed ignorance to the circumstances of these matters is unavailing." The court ultimately denied petitioner's motion for an improvement period,[4] finding that her testimony that she would do "anything under the sun" to not lose her children was contrary to her course of action during the proceedings and rendered her testimony disingenuous and incredible. The court further found that petitioner's "minimal, half-hearted, and inconsistent acknowledgement of her wrongdoing and particularly convenient severance from [L.L.'s father] at the . . . eleventh-hour is too little too late and highly unpersuasive." The court found petitioner's testimony was "riddled with excuses and attempts to deflect blame for her current situation onto anyone but herself," while at the same time finding that she "[n]ever once . . . truly blamed the culprit in these matters": L.L.'s father. According to the court, an improvement period would have been "manifestly harmful and prejudicial to the children." The court then concluded that subjecting the children to further risks of future harm by returning them to the home was not in their best interests and that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect in the near future because she made no meaningful improvement in the roughly twenty-one months the matter was pending. As such, the court terminated petitioner's parental rights.[5] It is from the dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

---

[4]During the dispositional hearing, petitioner also moved orally for a post-dispositional improvement period. That motion was also denied.

[5]L.L.'s father's parental rights were also terminated below. The permanency plan for the child is adoption in the current foster home. The permanency plan for C.D.-1 is to remain in the custody of the nonabusing father.

On appeal, petitioner first argues that the circuit court erred in terminating her parental rights "because [she] did not fail to protect her children from" L.L.'s father. Petitioner's argument, however, is both legally and factually flawed. First, petitioner filed a written stipulation after the adjudicatory hearing in which she expressly stated that she "does hereby admit she failed to protect [i]nfant [C.D.-1] from [the father of L.L.], as alleged in the [p]etition and [a]mended [p]etition." Further, the determination of whether she failed to protect the children was properly made in the circuit court's *adjudicatory* order, which she does not challenge on appeal. Confusingly, petitioner cites to the definition of "abused child" as set forth in West Virginia Code § 49-1-201, but then attacks certain findings from the circuit court's *dispositional* order. However, the determination as to whether a child is abused or neglected is made following the adjudicatory hearing, not the dispositional hearing. W. Va. Code § 49-4-601(i) ("At the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether the child is abused or neglected and whether the [parent] is abusing [or] neglecting . . . ."). Here, the circuit court's adjudicatory order contains extensive, detailed findings regarding petitioner's failure to protect the children from L.L.'s father, none of which petitioner challenges on appeal. Because petitioner's argument on appeal is factually and legally deficient, she necessarily cannot be entitled to relief upon this assignment of error.

Next, petitioner argues that the circuit court erred in denying her motions for post-adjudicatory and post-dispositional improvement periods. In support of these arguments, petitioner asserts that the evidence showed that she always attended court hearings and MDT meetings and rarely missed services with her parenting provider. Petitioner is correct that a parent's "entitlement to an improvement period is conditioned upon the ability of the [parent] to demonstrate 'by clear and convincing evidence, that the [parent] is likely to fully participate in the improvement period.'" *In re Charity H.*, 215 W. Va. 208, 215, 599 S.E.2d 631, 638 (2004) (citation omitted). What petitioner fails to recognize, however, is that the court denied her requests for improvement periods because of her continued relationship with L.L.'s father and her refusal to acknowledge that he intentionally harmed C.D.-1. As this Court has explained,

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). In denying petitioner's requests for improvement periods, the court found that petitioner continued to deny that L.L.'s father harmed C.D.-1 and that these refusals to acknowledge the conditions of abuse and neglect at issue resulted in making a potential improvement period "manifestly harmful and prejudicial to the children."

Petitioner attempts to address this issue by arguing that her continued relationship with L.L.'s father should not have been held against her because "at the adjudicatory stage [of the proceedings] . . . it was yet to be determined who caused [C.D.-1's] injuries." This argument is unavailing for several reasons. First, it was clear that the child suffered nonaccidental trauma while in the care of L.L.'s father well before the adjudicatory hearing, and petitioner's attempts to testify

to the unavailability of this information resulted in the court finding her testimony incredible. Second, even after her adjudication, petitioner continued to vacillate between affirmatively stating that the child suffered from shaken baby syndrome as a result of L.L.'s father's conduct and questioning whether L.L.'s father was responsible because she did not personally witness the child's injury. Further, the evidence shows that it was not until one week before the dispositional hearing that petitioner purportedly ended her relationship with L.L.'s father, a situation which the court expressed doubt over. As we have repeatedly explained, "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997). Also, the court noted that petitioner's purported separation from the father came at the eleventh hour and was, therefore, inconsequential. This finding is not only supported by the record, but it comports with West Virginia Code § 49-4-610(9), which provides, in relevant part, that "no combination of any improvement periods or extensions thereto may cause a child to be in foster care more than fifteen months of the most recent twenty-two months." By the time petitioner finally claimed to have ended her relationship with L.L.'s father, the children had already been out of the home[6] for approximately twenty-one months, well in excess of the timeframe allotted for improvement periods.

Further, petitioner's arguments on appeal only underscore her continued refusal to acknowledge the abusive and neglectful conditions in the home and the reality of the proceedings below. Specifically, petitioner argues on appeal that she "did not fail to protect her children" from L.L.'s father, despite the circuit court adjudicating her on that very ground, and she continues to deny that there was physical violence between herself and L.L.'s father despite the circuit court adjudicating L.L.'s father on that basis. This continued refusal to acknowledge the conditions of abuse and neglect fully supports the circuit court's decision to refuse petitioner's motions. As we have held, the decision to grant or deny an improvement period rests in the sound discretion of the circuit court. *See In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015) ("West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period."); Syl. Pt. 6, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996) ("It is within the court's discretion to grant an improvement period within the applicable statutory requirements . . . ."). Because the court determined that petitioner failed to acknowledge the conditions of abuse and neglect at issue, we find no error in the denial of her motions for improvement periods.

This same evidence also supports the circuit court's termination of petitioner's parental rights. On appeal, petitioner presents a single paragraph of argument in support of this assignment of error in which she asserts that the circuit court erred in failing to grant a less-restrictive dispositional alternative, such as legal guardianship for the child. However, petitioner does not challenge any of the circuit court's detailed findings regarding disposition, including the findings that termination of her parental rights was necessary for the children's welfare and that there was no reasonable likelihood that she could substantially correct the conditions of abuse and neglect in the near future. According to West Virginia Code § 49-4-604(c)(6), a circuit court may terminate parental rights upon such findings. Further, as this Court has held,

---

[6]Although C.D.-1 was placed with her nonabusing father at the time of the dispositional hearing, L.L. remained in foster care with a relative.

"[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Based on the overwhelming evidence in support of these determinations, which petitioner does not challenge on appeal, we find no error in the circuit court's termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its March 26, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: October 13, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton