**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**


*In re* **H.C. and J.C.**

**No. 21-0420** (Webster County 2020-JA-50 and 2020-JA-51)


**MEMORANDUM DECISION**


Petitioner Father R.C., by counsel Andrew Chattin, appeals the Circuit Court of Webster County's April 21, 2021, order terminating his parental rights to H.C. and J.C.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and James Wegman, filed a response in support of the circuit court's order and a supplemental appendix. The guardian ad litem, Mary Elizabeth Snead ("guardian"), filed a response on behalf of the children also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating his parental rights without granting him an improvement period.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In October of 2020, the DHHR filed an abuse and neglect petition against the parents alleging that they mentally and physically abused then thirteen-year-old H.C. and eleven-year-old J.C. and failed to protect H.C. from sexual abuse by a relative. According to the DHHR, the parents engaged in excessive corporal punishment such as pouring salt in the children's eyes and spanking them to the point of drawing blood. Petitioner also allegedly locked the children in their bedrooms or out of the house as punishment. The DHHR further maintained educational neglect of the children and that the parents engaged in domestic violence and marijuana use in the presence of the children. The petition noted that the children were adopted by petitioner and his wife after suffering abuse and neglect from their biological parents in a prior case. It also noted that neither child wanted to be placed with any of the parents' relatives. Thereafter, petitioner waived the

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

preliminary hearing, and although the circuit court ordered supervised visitations, the children refused to visit with the parents. That same month, petitioner filed a motion for an improvement period.

The circuit court held a contested adjudicatory hearing in December of 2020, and the DHHR presented the testimony of several witnesses. Petitioner's mother-in-law ("grandmother") testified that H.C. walked several miles to the grandmother's home because she was scared of the mother and that at another visit, J.C. showed her severe bruising on his buttocks. J.C. told the grandmother that the mother caused the bruising by beating him with a paddle. Next, a Child Protective Services ("CPS") worker testified that both children reported the parents' marijuana use and observed drug paraphernalia in the home. A second worker testified that H.C. reported being locked in her room for thirty days without a bed and was only allowed to come out to eat and use the bathroom. H.C. reported another time when she was locked in her room for three days and only given water to drink. H.C. stated that she was forced to urinate in a bottle. The child also described receiving punishment by getting salt poured into her eyes. This worker also stated that H.C. described sexual abuse by the mother's father ("grandfather") and that petitioner was aware of the abuse. This worker testified that when she interviewed J.C., he corroborated much of the same information provided by H.C.

A third CPS worker testified that she investigated the initial referral and was the first contact with the children. Initially, H.C. was afraid to speak to the worker but eventually reported instances of abuse such as being locked outside in her underwear one night and having to sleep in the car. She reported being spanked to the point of bleeding and that the mother told her she had a demon inside of her. When the worker interviewed J.C., he also stated that the mother told him "CPS was bad" and that he was not to talk to the worker. He told the worker not to leave because he would get hurt "real bad" when she left. He also disclosed being severely spanked by each of the parents and that he was embarrassed that he was illiterate. Both children disclosed regular domestic violence in the home and being held down by petitioner when the mother poured salt into their eyes for punishment. The worker stated that when she interviewed the mother, she admitted she had failed to home school the children recently and had not acquired the "books and stuff." The mother denied all of H.C.'s claims, but stated that petitioner had been physically abusive towards her and had caused her bruising. She further stated that petitioner once held her down and choked her. The worker explained that she interviewed petitioner last, and he admitted that the mother could be "excessive when she spanks" and confirmed that the mother locked H.C. outside in her underwear. Petitioner further admitted to arguments with the mother and to holding her down but denied choking her or leaving marks on her. He also admitted to damaging a door with a broomstick during an altercation. The worker stated that after all of the interviews, she determined the children were not safe in the home and that removal was necessary. While removing the children, the worker testified that the mother told her not to place H.C. with the grandparents because the grandfather had been molesting H.C.

A child forensic interviewer testified regarding her interviews with H.C. and J.C. She stated that J.C. disclosed cruel and strange punishments such as the parents pouring salt in their eyes and the mother forcing the siblings to poke forks into each other's ears. J.C. confirmed that the parents engaged in domestic violence and would blow marijuana smoke into his face. He also reported being locked in his room for days and corroborated H.C.'s statements of being locked in her room

2

for thirty days. During H.C.'s interview, she confirmed J.C.'s disclosures and stated that petitioner held the children over the side of the sink while the mother poured saltwater into their eyes. H.C.'s disclosures were also consistent with what the CPS workers testified to regarding her being locked in her room, her molestation by the grandfather, and the educational neglect. H.C. stated that the "whole family knew" about the molestation because the mother told everyone.

Finally, a state trooper testified regarding the allegations of the grandfather's molestation of H.C. He stated that the mother admitted that she was aware of the sexual abuse and had known about it for years. In fact, the trooper stated that the grandfather admitted to the molestation to another trooper investigating the crime. Nevertheless, neither parent filed criminal charges or reported the sexual abuse and continued to allow H.C. to stay with the grandfather. It was not until near the children's removal that the mother addressed the issue and cooperated with law enforcement. Thereafter, neither parent testified. After the close of evidence, the circuit court found clear and convincing evidence that the children were abused and neglected and adjudicated the parents as abusing parents.

Prior to the final dispositional hearing, the guardian filed her report detailing the children's welfare. The report stated that J.C. suffered so much trauma that he was hospitalized for suicidal and homicidal ideations in December of 2020 but was released to a specialized foster home in January of 2021. Due to J.C.'s violent outbursts, the children were separated, but exercised sibling visitation. H.C. was placed in another foster home and had bonded with another girl in the home. Both children were diagnosed with various mental health issues related to the trauma suffered while in the parents' care. Additionally, both children had been severally educationally neglected and had reading and math levels far below the requirements for their ages.

The circuit court held a dispositional hearing over the course of two days in April of 2021. The DHHR presented the testimony of several witnesses, including the DHHR worker, service providers, and a state trooper, among others. Testimony established that petitioner failed to complete parenting education classes, as he missed five of the fifteen classes and was late for one. The provider opined that the parents made no progress as they maintained that they had done nothing wrong and believed that their discipline was appropriate. Testimony also established that the parents failed to fully cooperate with the CPS workers and were "hard to get a hold of." The parents also failed to follow drug screening protocol and continued to blame H.C. for the case. The parents believed that CPS had manipulated the children. The worker stated that the children expressed their wishes in favor of the termination of the parents' parental rights.

Next, petitioner's counselor testified that petitioner had attended twelve sessions and had been cooperative. According to the counselor, petitioner believed that J.C.'s bruising was caused when J.C. fell in a creek and not from paddling. The therapist stated that petitioner denied that the saltwater was punishment but rather a "home remedy" for pink eye. When questioned about the children being locked in their rooms, excessive corporal punishment, or allegations of domestic violence, the therapist stated he had no knowledge any of that information.

Petitioner testified and denied all wrongdoing and the allegations in the petition. He admitted to having "pretty heated arguments" with the mother and explained that they did "home remedies for basically everything," which included salt water in the children's eyes for pink eye.

He stated that H.C. had been grounded to her room but was allowed to leave to eat and use the restroom. However, he stated that H.C. once defecated in the trashcan of her bedroom. Regarding the children's education, he stated that there were no issues with homeschooling. Petitioner denied that H.C. was locked outside of the house in her underwear, rather the child was allowed to come back in. Despite this, he stated that he and H.C. sat outside in his truck for the night. Petitioner also testified that the mother and the children abruptly left the home in September of 2020 and stayed at a hotel.

The mother testified and likewise denied all allegations but conceded that she spanked and paddled the children. She stated that petitioner had been in charge of the children's homeschooling for the previous two years. She also confirmed that the children were locked in their rooms as punishment for three days but denied that they had to relieve themselves in bottles or buckets. The mother admitted to seeing unusual behavior between H.C. and the grandfather in 2015 and when she spoke to H.C. about it, H.C. disclosed sexual abuse. The mother stated that she reported this information to petitioner but ultimately, they did not believe H.C. and thought she was "deflecting." Despite this, petitioner did not report the abuse to the police, nor take any action to protect H.C. from the grandfather's sexual abuse until the mother cooperated with police in October of 2020.

At the close of evidence, the court found that that parents denied domestic violence in the home while also admitting to acts that would constitute domestic violence. The court made special note that petitioner knew of H.C.'s sexual abuse since 2015, yet did nothing to protect the child from further abuse. The court concluded that neither parent accepted "any responsibility in this matter and has continued to minimize their conduct and blame each other and the children." The circuit court denied petitioner's request for an improvement period, finding that he failed to show that he was likely to improve and that there were no services that could correct these circumstances of abuse and neglect. Ultimately, the circuit court found that there was no reasonable likelihood that the conditions of abuse and neglect could be corrected in the future. Accordingly, the circuit court terminated petitioner's parental rights. Petitioner appeals the April 21, 2021, dispositional order.[2]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However,

---

[2]The mother's parental rights were also terminated below. The permanency plan for J.C. is adoption by a foster family. The permanency plan for H.C. is permanent guardianship with another foster family.

4

a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in terminating his parental rights without first granting him an improvement period. In support, petitioner contends that he participated in counseling, parenting classes, and drug screens. Petitioner argues that evidence presented at the dispositional hearing showed that he was "on track" and that he would have continued to correct the conditions of abuse and neglect if granted an improvement period. Petitioner points to the testimony of the CPS worker at the dispositional hearing stating that petitioner remained drug free during the proceedings and that there had been no new domestic violence incidents. He also cites his therapist's testimony that he was cooperative and was working towards correcting parenting deficiencies and domestic violence issues. As petitioner testified that he would comply with the terms and conditions of an improvement period and admitted to having some marital problems, petitioner argues that he should have been granted an improvement period.

West Virginia Code § 49-4-610(2)(B) provides that the circuit court may grant a parent a post-adjudicatory improvement period when the parent "demonstrates, by clear and convincing evidence, that the [parent] is likely to fully participate in the improvement period." "This Court has explained that 'an improvement period in the context of abuse and neglect proceedings is viewed as an opportunity for the . . . parent to modify his/her behavior so as to correct the conditions of abuse and/or neglect with which he/she has been charged.'" *In re Kaitlyn P.*, 225 W. Va. 123, 126, 690 S.E.2d 131, 134 (2010) (citation omitted). Finally, the circuit court has discretion to deny an improvement period when no improvement is likely. *In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002).

Most importantly, we have explained that

[i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). While petitioner may have complied with some of the DHHR's services, the record clearly shows that petitioner failed to acknowledge the most basic allegations of abuse. Despite evidence that the grandmother witnessed severe bruising on J.C.'s buttocks and he reported to her that the bruises were from the parents' paddling him, and H.C.'s consistent disclosure that she had been paddled and spanked to the point of bleeding, petitioner continued to believe that the spanking and paddling of the children was not excessive or inappropriate in anyway. Further, evidence showed that H.C. was outside in her underwear and stayed in the truck with petitioner during a night in accordance with some punishment that petitioner condoned. Additionally, petitioner admitted that the children

were "grounded" in their bedrooms for at least three days and that H.C. once defecated in her trash bin. Shockingly, the mother admitted that she had known of H.C.'s disclosure of sexual abuse by the grandfather since 2015 and that she told petitioner, but the couple did not believe the child and did nothing to investigate, and thus exposed the child to years of potential further abuse. Petitioner admitted that there was general discord in the family as the mother and the children left to stay in a hotel room in September of 2020, and that he and the mother regularly had "heated arguments." The circuit court considered the discrepancies between the parents' testimonies and the consistencies between the disclosures of the children during interviews and to CPS workers and found the parents' testimony and explanations incredible. As this Court has long held, "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997).

Indeed, even without considering the specific details or other facts that petitioner disputes, the above instances are those to which petitioner *admitted* to and these instances alone show that petitioner knowingly inflicted emotional and physical abuse upon the children. Regardless, consistent with this Court's prior holdings, petitioner's failure to acknowledge the conditions of abuse and neglect, and especially the extent thereof, render those conditions untreatable, and, therefore, any improvement period would have been an "an exercise in futility at the child[ren]'s expense." *Timber M.*, 231 W. Va. at 55, 743 S.E.2d at 363. Accordingly, we find no error in the circuit court's denial of petitioner's improvement period.

Finally, we find no error in the circuit court's termination of petitioner's parental rights. West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate parental rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the children's welfare. West Virginia Code § 49-4-604(d)(5) provides that a circuit court may determine that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected when

> [t]he abusing parent or parents have repeatedly or seriously injured the child physically or emotionally, or have sexually abused or sexually exploited the child, and the degree of family stress and the potential for further abuse and neglect are so great as to preclude the use of resources to mitigate or resolve family problems, or assist the abusing parent or parents in fulfilling their responsibilities to the child.

Here, the record clearly shows that both children have disclosed extensive emotional and physical abuse by petitioner over the course of several years. Both children refused visits with the parents and both stated wishes to never have contact with them again. The children disclosed various forms of abuse including embarrassing and cruel punishments such as being locked out of the house in underwear, relieving themselves in bottles while being locked in rooms, and being spanked and paddled to the point of bruising and bleeding. Evidence presented at the dispositional hearing showed that the parents admitted to constant arguments and petitioner admitted to holding the mother down on one occasion and damaging a door with a broomstick on another occasion. Notably, petitioner admitted that he did not believe H.C. about her disclosure of sexual abuse and

chose to believe that the child was "deflecting" to avoid other punishments. Moreover, the guardian's report indicated that both children suffered such egregious abuse that they had to be placed in separate placements, receive therapy, and given extra schooling for the severe educational neglect. Given these issues, it is apparent that "the degree of family stress and the potential for further abuse and neglect are so great as to preclude the use of resources to mitigate or resolve family problems, or assist the abusing parent or parents in fulfilling their responsibilities to the child[ren]." *Id*. Accordingly, we find that ample evidence supported the circuit court's finding that there was no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future. Based on the evidence set forth above, we find no error in the circuit court's termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its April 21, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: January 12, 2022

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton

7