**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **C.E.-1, C.E.-2, M.E., K.E.-1, C.E.-3, K.E.-2, J.E.-1, and J.E.-2**

**No. 21-0657** (Mason County 19-JA-74, 19-JA-75, 19-JA-76, 19-JA-77, 19-JA-78, 19-JA-79, 19-JA-80, and 19-JA-81)

**MEMORANDUM DECISION**

Petitioner Father S.E., by counsel Jeffrey A Davis, appeals the Circuit Court of Mason County's July 14, 2021, order terminating his parental rights to C.E.-1, C.E.-2, M.E., K.E.-1, C.E.-3, K.E.-2, J.E.-1, and J.E.-2.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem, Michael N. Eachus, filed a response on behalf of the children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating his parental rights because his substantive and procedural due process rights were violated.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Prior to the proceedings giving rise to the current appeal, petitioner and the children's mother had an extensive history of Child Protective Services ("CPS") involvement. According to the DHHR's petition and amended petition in the current matter, the parents had two prior CPS cases: one that began in 2013 and continued through 2014 and another that began in 2016 and ran through 2019. A third CPS case was opened and eventually gave rise to the current proceedings.

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because several of the children share the same initials, numerals have been included with the children's initials, where necessary, in order to differentiate them from one another.

Although not entirely clear from the record, it appears that these CPS cases also gave rise to prior abuse and neglect proceedings, as petitioner asserts on appeal that "[p]rior to the instant case, the parents were the subject of two abuse and neglect proceedings." Additionally, the record includes references from the court to the instant proceedings being the third abuse and neglect case filed against the parents. Relevant to the issues on appeal is the undisputed fact that petitioner received services over a period of several years prior to the filing of the instant petition.

In November of 2019, the DHHR filed the petition giving rise to the current proceedings. The petition alleged that the children suffered from various injuries, including the following: burns on K.E.-2's face after she and C.E.-3 were left unsupervised and played with a campfire; bruising on J.E.-1's back and scratches on her neck and face, which child C.E.-1 reported were caused when the mother "hit her with a shoe"; and a "puss bleeding gash" on C.E.-1's head. The DHHR also alleged that an inspection revealed that the home was unsafe, as clutter, food, and trash throughout the home could harm the children. Based on these circumstances, the DHHR alleged that petitioner was unable to properly care for the children or assure their safety in the home. The DHHR also asserted that the parents "have exhausted all of the Department's in-home services over the course of four (4) years." It is also important to note that all of the children involved in these proceedings have special needs of some type. The children who attend school are in special education programs, and all the children have impairments with their speech.

In January of 2020, the DHHR filed an amended petition alleging that when the children were removed, the parents provided them with dirty and moldy bottles that were not fit for the children to drink from. The DHHR also alleged medical neglect as J.E.-1 suffers from cerebral palsy, yet the parents failed to comply with Birth to Three services, resulting in the child being dropped from critical services. J.E.-1 also likely required glasses and had several teeth that required caps. The DHHR further alleged that three of the children reported that the mother would hold their heads underwater as punishment, and that then-ten-year-old M.E. disclosed to a teacher "that there has been child sex abuse by" the mother.

The court held adjudicatory hearings in July of 2020 and February of 2021, during which the DHHR presented evidence from DHHR workers and service providers. The guardian also presented evidence from various medical specialists and education personnel. Following the hearings, the court took adjudication under advisement and directed that the parties could submit proposed adjudicatory findings. Ultimately, the court found that the condition of the home was unsuitable for the children, an issue for which the children had been removed in a prior proceeding. Further, the court found that petitioner's testimony on this issue lacked credibility. Petitioner testified that CPS appeared while he was in the midst of remodeling and that the home would have been totally clean a few hours later. The court found this testimony especially egregious, given that the conditions in the home were a cause of prior CPS involvement.

The court also found that the parents failed to provide appropriate and necessary medical and dental care, which resulted in the children having painful dental surgery to deal with the lack of care. Of particular importance to the circuit court was the fact that J.E.-1 was discharged from Birth to Three, physical therapy, and other services simply because the parents missed multiple appointments. At the time the three-year-old child was removed, she struggled to speak in complete sentences, could not walk without assistance, and could barely stand on her own. Further,

the parents routinely sent the child to school without her walker or braces, which had been prescribed. The court also found that J.E.-1's weight loss after being returned to the parents was a result of their failure to provide her with proper nutrition.

In regard to the other children, the court found that those who attended school were chronically and habitually absent and that when they did attend, "they were filthy and had a foul odor." Personnel at their school permitted them to bathe on the premises, washed their clothes, and provided them deodorant on a regular basis. Additionally, the court found that the parents failed to properly supervise the children, as C.E.-2 once returned to school after the day concluded because he was afraid to go home. Ultimately, the court found that petitioner "demonstrate[d] a clear desire to not protect the children and a deliberate failure to provide for the care necessary to ensure the health, safety and welfare of the children" by testifying that he always made the final decisions in the home, his overbearing attitude during his testimony, and his admissions to prohibiting the mother from participating in services. As such, the court adjudicated petitioner of neglecting the children.

In March of 2021, the DHHR filed a motion to terminate the parents' parental rights. The following month, petitioner filed a motion for a post-adjudicatory improvement period. Additionally, petitioner underwent a forensic psychological evaluation prior to disposition.

On May 20, 2021, the court held a dispositional hearing, during which the DHHR presented testimony from several witnesses and petitioner testified. The court then took disposition under advisement and ordered the parties to submit proposed findings of fact and conclusions of law. In its ultimate order, the court found that the parents did not receive any services during the proceedings, other than supervised visitation. The DHHR's position was that all services had been exhausted prior to removal, and the court found that "appear[ed] to be accurate." According to the court, the family began receiving services in 2013, yet there had been no significant improvement. In fact, the court found that despite prior intervention, the conditions in the home were worse than when the DHHR first intervened.

The court also cited to a forensic evaluator describing both parents as having "historically poor responsiveness to intervention." According to petitioner's evaluation, he suffers from untreated mental health issues and maladaptive personality traits. During his evaluation, petitioner disputed the allegations of abuse and neglect and presented himself as "a voice of reason battling CPS workers and . . . providers with malevolent intentions." He further alleged that the issues that led to the petition's filing had already been resolved. As such, the psychologist opined that petitioner's prognosis for improved parenting was "poor."

Turning to the service petitioner did participate in, the court described visitation with the children as "chaotic and at times unsafe for the children," which required intervention by providers. Further, at the most recent visit, the floor was covered with coats, toys, and food. Also, J.E.-1 tripped on the clutter and fell backward into a trashcan, which neither parent noticed. The court also highlighted evidence that C.E.-2 had problems with "feeling down" after visits and that K.E.-1 and M.E. expressed a desire not to live with their parents. The court then focused on the "drastic improvement" the children displayed after being placed in foster care. Their communication skills

improved; they are happy, proud of their accomplishments, and healthy; and they improved in school.

Ultimately, the court found that petitioner "remained defiant, . . . failed to acknowledge his neglect[,] and refused to accept any responsibility for the condition of his children, blaming everyone else." As such, the court determined that petitioner could not satisfy the burden for obtaining an improvement period and found that there was no reasonable likelihood the conditions of abuse and neglect could be substantially corrected in the near future. The court also found that termination of petitioner's parental rights was necessary for the children's welfare, especially considering their extensive special needs. As such, the court terminated petitioner's parental rights.[2] It is from the dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner asserts that his procedural and substantive due process rights were violated in two ways: the first being when his rights were terminated upon the court's finding that "he has remained defiant, has failed to acknowledge his neglect[,] and refused to accept any responsibility for the condition of his children, blaming everyone else." On appeal, petitioner "asserts that maintaining his innocence to the allegations of the petition should not be a basis for terminating his fundamental parental rights to his children." This argument cannot entitle petitioner to relief, however, because it ignores years of precedent from this Court and is entirely without a basis in the law.

While it is true that petitioner was entitled to challenge the allegations against him, once he was adjudicated of neglecting the children, the conditions of neglect at issue ceased being mere allegations and became fact. According to West Virginia Code § 49-4-601(i),

---

[2]The mother's parental rights were also terminated below. The permanency plan for the children is adoption in their current foster homes.

4

[a]t the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether the child is abused or neglected and whether the respondent is abusing, neglecting, or, if applicable, a battered parent, all of which shall be incorporated into the order of the court. The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

The circuit court in this matter complied with this statute and adjudicated petitioner of neglect. Petitioner does not challenge his adjudication on appeal. Instead, he believes he should be permitted to continue proclaiming his innocence in the face of clear and convincing evidence that he neglected the children. Petitioner is, of course, entitled to ignore the substantive evidence against him, but he may not escape the consequences of his continued refusal to acknowledge the conditions of neglect at issue.

As this Court has repeatedly stressed,

[i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). On appeal to this Court, petitioner continues to refer to the proven conditions of neglect as "allegations," only underscoring the need to terminate his parental rights. Because of petitioner's continued refusal to accept responsibility for the conditions that led to the filing of the instant petition—conditions that the DHHR worked to address since as early as 2013—there was no reasonable likelihood that petitioner would ever correct those conditions. As such, it is clear that petitioner's argument that maintaining his innocence as to these allegations could not serve as the basis for termination of his parental rights has no basis in the law and entitles him to no relief.

Finally, petitioner alleges that termination of his parental rights violated his due process rights because the court erred in finding that the DHHR made reasonable efforts to reunify the family. According to petitioner, he received no services during the proceedings and the finding that all services had been exhausted was not founded. Petitioner asserts that the only services he previously received were parenting and adult life skills, while "the DHHR has access to more in[-]depth, additional[,] or different services that could have aided him in the reunification of his family." We find, however, that this argument cannot entitle petitioner to relief.

What petitioner fails to recognize is that the DHHR is not required to make reasonable efforts to preserve the family in all circumstances. According to West Virginia Code § 49-4-604(c)(7)(A),

[f]or purposes of the court's consideration of the disposition custody of a child pursuant to this subsection, the department is not required to make reasonable efforts to preserve the family if the court determines: . . . The parent has subjected

the child, another child of the parent or any other child residing in the same household or under the temporary or permanent custody of the parent to aggravated circumstances which include, *but are not limited to*, abandonment, torture, chronic abuse, and sexual abuse.

(Emphasis added). While the circuit court below did not explicitly find that this case constituted one of aggravated circumstances, the evidence overwhelmingly supports such a finding. As set forth above, the parents began receiving service in 2013 and, at one point, had a case that proceeded for three years. Despite the DHHR's extended efforts, the petition in this matter was filed a matter of months after the prior case was closed. As the list of aggravated circumstances set forth in this statute is non-exhaustive, this Court has had occasion to address whether similar circumstances constitute aggravated circumstances and have concluded that they do.

Specifically, in *In re C.C.*, the Court was asked to find error in the termination of a parent's parental rights when no services were offered during the proceedings. No. 19-0322, 2019 WL 6139581, at * (W. Va. Nov. 19, 2019)(memorandum decision). In denying the parent relief in that matter, we concluded as follows:

> Given such an abbreviated time between the dismissal of the first petition and filing of the second petition, viewed in combination with the extensive DHHR services provided during the first case such that no other or additional services were available or prospectively helpful to [p]etitioner, we cannot find that the circuit court erred in concluding that DHHR was not required to provide services under these particular circumstances.

*Id.*, at *5. This is the exact scenario at issue in the current appeal. Petitioner received services for years, including through the time period shortly before the filing of the instant petition, yet failed to make any meaningful change to his conduct as a result of these services.

We must also note that it is curious that petitioner argues on appeal that he required services to correct the conditions of neglect at issue, given his statement during his psychological evaluation that those conditions had been resolved, his testimony at adjudication that the conditions in the home would have been remedied in a matter of hours, and his refusal throughout the entirety of the proceedings to acknowledge his neglectful conduct. As we noted in *C.C.*, "[p]etitioner's continued denial that conditions of abuse and neglect existed strikes at the crux of why the circuit court terminated [p]etitioner's parental rights, and why we do not find that the circuit court was clearly erroneous in doing so." *Id*. Accordingly, petitioner is entitled to no relief in this regard.

Because the court found that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect in the near future and that termination of his parental rights was necessary for the child's welfare, termination was appropriate under West Virginia Code § 49-4-604(c)(6). On appeal, petitioner does not challenge these findings. Further, we have explained that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia

6

Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). As such, we find no error in the court's termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its July 14, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: March 9, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice Alan D. Moats sitting by temporary assignment

7