**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **R.W., H.S., and A.L.**

**No. 21-0894** (Kanawha County 21-JA-169, 21-JA-170, and 21-JA-171)

**MEMORANDUM DECISION**

Petitioner Mother H.L., by counsel Sandra K. Bullman, appeals the Circuit Court of Kanawha County's October 1, 2021, order terminating her parental rights to R.W., H.S., and A.L.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Katica Ribel, filed a response in support of the circuit court's order. The guardian ad litem, J. Rudy Martin, filed a response on behalf of the children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating her parental rights without first granting her an improvement period and when less restrictive alternatives were available.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In April of 2021, the DHHR filed a petition alleging that petitioner had a history of involvement with Child Protective Services ("CPS"). According to the petition, CPS became involved with the family in 2017 because of drug abuse and medical neglect. The children were returned to the parents after they complied with services. However, the DHHR had recently received a referral that petitioner was "having mental health issues and possible issues with drug abuse." Upon investigation, CPS discovered that petitioner had recently taken R.W. and H.S. into a parking lot because she believed someone was attempting to hurt the children and kidnap them. When petitioner took the children outside, it was cold and neither child had on shoes or coats.

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

During the investigation, both R.W. and H.S. described this incident. According to R.W.'s disclosure, petitioner "yelled at her brother to run and get help." The record shows that law enforcement and emergency personnel eventually responded to this incident and petitioner was taken to the hospital. That same evening, law enforcement responded to an incident in which petitioner entered a stranger's home. Petitioner was not wearing shoes, had on inadequate clothing, and was wearing a hospital bracelet. According to the officer who observed petitioner at that time, she appeared to be under the influence of methamphetamine.

According to the DHHR, both R.W. and H.S. disclosed a fear of petitioner, especially when she "talks weird," such as telling the children there are ghosts in the home or that people were coming after them. Additionally, one of the children's fathers disclosed that he had witnessed petitioner behaving erratically, including one incident where the mother contacted him at 4:30 a.m. to tell him someone was taking the children and that there were people in her attic, "possibly sex traffickers." Although petitioner admitted to having a "nervous breakdown," she indicated that she did not recall many aspects of the various disclosures, such as claiming people were going to harm her or the children or yelling at the children to get help. Petitioner referred to the allegations against her as "inaccurate" and "silly." She also denied any mental health issues.

At a preliminary hearing in May of 2021, petitioner repeatedly interrupted the proceedings and then abruptly left the courtroom before the hearing ended. Thereafter, petitioner was ordered to participate in drug screens; therapy; parenting and adult life skills services; a psychological evaluation; and, if necessary, drug rehabilitation.

According to a DHHR summary, petitioner told the DHHR after the preliminary hearing that "the petition was all false allegations." Petitioner also sent a CPS worker a text message accusing CPS of exploiting the children for money and emotionally abusing the children with false allegations of abuse and neglect. Further, petitioner told CPS that she was unable to participate in services because her grandfather passed away and she was in Virginia for a period. Providers attempted to contact petitioner in order to administer services, but petitioner "told them she was still in Virginia." Additionally, according to the court summary, petitioner sent threatening text messages to R.W.'s paternal grandmother in which petitioner threatened to kill her.

In June of 2021, the court held an adjudicatory hearing, during which the DHHR presented testimony from the CPS worker who initially investigated the matter. The CPS worker testified consistently with the allegations in the petition. According to the witness, petitioner had two of the children outside with no coats or shoes to protect against the cold while she experienced "some sort of episode" that required her transportation to a hospital. Petitioner then left the hospital against medical advice and entered a stranger's home. When law enforcement arrived, petitioner appeared to be under the influence of methamphetamine and was incoherent. The witness also indicated that petitioner claimed to suffer from post-traumatic stress disorder ("PTSD") and had a family history of schizophrenia. According to the witness, the DHHR initially offered petitioner services prior to filing the petition. However, within a week, petitioner stated that she did not want to comply with services "due to her religion." The DHHR also presented testimony from R.W.'s father, who confirmed much of the CPS' workers testimony. Petitioner then testified, claimed that she suffers from PTSD, and indicated that she did not remember many of the events that gave rise to the petition. Ultimately, the court found that petitioner abused and neglected the children. As

the court made its findings, petitioner "interrupted the proceedings with a verbal outburst." The court then advised petitioner that she would not be permitted visits with the children until she complied with the previously ordered services.

Following this hearing, petitioner tested positive for drugs on seven different occasions. One screen was positive for methamphetamine and THC, while the remaining six screens were positive for THC. Petitioner claimed that she used marijuana to treat her PTSD but failed to produce a valid prescription. She also denied using methamphetamine.

During a hearing in July of 2021, the court ordered petitioner to enroll in an inpatient substance abuse treatment program consistent with the recommendations contained in her psychological evaluation. According to the psychologist who examined petitioner, there was an "extremely poor" prognosis for improved parenting. This was based on petitioner's "utter failure to accept responsibility," her long-term substance abuse that exacerbated her psychotic behaviors, her tenuous grasp on reality that prompted her to put the children in danger, and her highly dysfunctional personality traits. The psychologist concluded that "[t]here are currently no services or interventions . . . that could be expected to correct [petitioner's] parenting within a reasonable time, if at all." The court also ordered that petitioner participate in domestic violence counseling.

According to a court summary from August of 2021, when a DHHR worker contacted petitioner to inform her of an additional failed screen that was positive for methamphetamine and THC, petitioner "started yelling and stating that we were setting her up and she never failed a drug screen." The DHHR was also informed that petitioner did not have a valid prescription for marijuana. According to the DHHR, petitioner was positive for THC on every screen she submitted to, and positive for methamphetamine on three screens. The DHHR also asserted that services were set up for petitioner in April of 2021, but she did not begin compliance until June of 2021. Accordingly, the DHHR recommended termination of petitioner's parental rights.

Shortly thereafter, the guardian filed a report in which he recommended termination of petitioner's parental rights. According to the guardian, petitioner was largely noncompliant during the proceedings "and often abusive and combative with Department personnel." The guardian also noted petitioner's continued positive drug screens and the "grave assessment" from her psychological evaluation.

In September of 2021, the court held a dispositional hearing. The DHHR presented testimony from a caseworker who explained that petitioner's participation in services was inconsistent. The witness also indicated that petitioner never produced a negative drug screen during the proceeding and that even if petitioner had a valid prescription for marijuana, there were currently no dispensaries in West Virginia, meaning that petitioner was buying the drug illegally. Further, petitioner tested positive for methamphetamine several times during the proceedings. Because of her continued positive screens, petitioner had no visits with the children. The witness also explained that petitioner refused to participate in domestic violence counseling.

Petitioner testified that she received a medical marijuana card on September 3, 2021, and had been living at a sober living facility for one week. Petitioner also indicated that she was beginning employment the day of the dispositional hearing and requested that the court grant her

3

previously filed motion for an improvement period. The court then questioned petitioner about the lack of a diagnosis of PTSD from petitioner's psychological evaluation. The court concluded that petitioner "did not have an actual diagnosis of PTSD" and "did not provide any explanation for her continued use of marijuana." The court also noted that petitioner's most recent drug screen was positive for gabapentin (an anticonvulsant medication), for which petitioner did not have a valid prescription.

The court denied petitioner's motion for an improvement period and found that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect because petitioner "has not made any efforts to rectify the circumstances which led to the filing of the [p]etition." The court found that petitioner failed to participate in services and tested positive for drugs throughout the proceedings. The court also found that petitioner refused to accept responsibility for her actions and demonstrated no willingness or desire to parent the children. Further, the court found that the children's best interests required termination of petitioner's parental rights. Accordingly, the court terminated petitioner's parental rights.[2] It is from the dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner first argues that termination was inappropriate because she should have been granted an improvement period. According to petitioner, an improvement period was appropriate because she was complying with some services, had just received her medical marijuana card for PTSD, and had recently begun receiving help from her sober living facility. Petitioner also argues that the children were placed with their fathers, so additional time for her to demonstrate improvement was justified. We do not agree.

---

[2]The permanency plan for R.W. and A.L. is to remain with their nonabusing fathers. H.S.'s father is deceased, and the permanency plan for that child is adoption by the father of R.W.

4

The record is clear that petitioner's minimal compliance with limited services was insufficient to obtain an improvement period, especially in light of her combative interactions with DHHR personnel, refusal to fully comply with the services offered, and failure to acknowledge the conditions of abuse and neglect at issue. To this last issue, the Court has previously explained that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). Beyond her refusal to accept responsibility for her conduct, the record further shows that petitioner could not satisfy the applicable burden for obtaining an improvement period. According to West Virginia Code § 49-4-610, a parent must "demonstrate[], by clear and convincing evidence, that [they are] likely to fully participate in the improvement period" in order to be granted the same. The record overwhelmingly shows that petitioner could not meet this burden, as she waited several months before beginning even her meager compliance with services, to say nothing of her continued substance abuse throughout the entirety of the proceedings. Simply put, petitioner demonstrated an unwillingness to participate in services such that the circuit court did not abuse its discretion in denying her motion. *See In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015) ("West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period.").

Finally, petitioner argues termination was not justified because the court could have imposed a less restrictive alternative by simply placing the children in the custody of relatives. This argument is entirely without merit, as we have repeatedly explained that West Virginia Code § 49-4-604 "permits the termination of one parent's parental rights while leaving the rights of the nonabusing parent completely intact, if the circumstances so warrant." *In re Emily*, 208 W. Va. 325, 344, 540 S.E.2d 542, 561 (2000). Further, "simply because one parent has been found to be a fit and proper caretaker for [the] child does not automatically entitle the child's other parent to retain his/her parental rights if his/her conduct has endangered the child and such conditions of abuse and/or neglect are not expected to improve." *Id*.

On appeal, petitioner does not challenge the circuit court's finding that there was no reasonable likelihood that she could substantially correct the conditions of abuse and neglect in the near future. Indeed, this finding was based on substantial evidence, including petitioner's failure to follow through with rehabilitative services designed to address the issues of abuse and neglect. *See* W. Va. Code § 49-4-604(d)(3). Further, we have explained that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be

substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Accordingly, we find no error in the circuit court's termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its October 1, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: April 14, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice Alan D. Moats sitting by temporary assignment